## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Thomas N. Reichert, on behalf of himself and all others similarly situated, | **Civil Action No.:** |
| Plaintiff, | |
| v. | |
| Kellogg Company, the Kellogg Company Pension Plan, the Kellogg Company – Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Plan, the Kellogg ERISA Finance Committee, the Kellogg ERISA Administrative Committee, the Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Committee, and John/Jane Does 1–20, | CLASS ACTION |
| Defendants. | |

Plaintiff Thomas N. Reichert, by and through his undersigned attorneys, on behalf of himself and all others similarly situated, states and alleges matters pertaining to himself and his own acts, upon personal knowledge, and as to all other matters, upon information and belief, based upon the investigation undertaken by his counsel, as follows:

1

## I.   **INTRODUCTION**

1.     This is a case about Defendants unlawfully shortchanging participants of the Kellogg Company Pension Plan (the "**Plan**") and the Kellogg Company – Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Plan (the "**BCTGM Plan**") (collectively, the "**Plans**") by millions of dollars through their use of outdated formulas to calculate pension benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). By using outdated formulas to calculate joint and survivor annuities and preretirement survivor annuities for participants of the Plans, Defendants have harmed the financial security of these retirees and their loved ones, to Defendants' financial gain.

2.     Defendants had a fiduciary duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).  Defendants disregarded that duty, electing to use unreasonable and outdated formulas for payment of pension benefits that substantially underpaid participants of the Plans for Defendants' own financial gain.

3.     Plaintiff brings this class action against Kellogg Company ("**Kellogg**"), the Kellogg ERISA Finance Committee (the "**Finance Committee**"), the Kellogg ERISA Administrative Committee (the "**Administrative Committee**"), the Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Committee (the

"**BCTGM Committee**") (collectively, with the Finance and Administrative Committee, the "**Committees**"), and the individual members of the Committees during the relevant time period (collectively, "**Defendants**") for violations of ERISA's actuarial equivalence requirements.

4.      Plaintiff and the Class (as defined below) are vested participants in the Plans, which deprive them of monies to which they are entitled. Specifically, Plaintiff and Class Members are retired Kellogg employees who receive pension benefits in the form of a joint and survivor annuity or a preretirement survivor annuity.

5.      Defendants use outdated formulas, which, upon information and belief, are based on outdated actuarial assumptions, to calculate these types of benefits. These formulas result in Plaintiff and Class Members receiving less than the "actuarial equivalent" of their vested benefits, in violation of ERISA's actuarial equivalence requirements.

6.      Kellogg sponsors the Plans, under which participants earn pension benefits in the form of a single life annuity ("**SLA**"). An SLA is a monthly benefit for the life of the participant. However, participants can elect to receive their pension benefits in forms other than an SLA, such as a joint and survivor annuity ("**JSA**").

7.      For married participants the default form of pension payment is a JSA, which provides retirees with a monthly annuity for their lives and, when they die, a

contingent annuity for the life of their spouse or beneficiary. *See* 29 U.S.C. § 1055(a). Plans label JSAs as a percentage of the benefit paid during the beneficiary's life. A 50% JSA pays the spouse half the amount the retiree received each month; a 75% JSA pays the spouse three-quarters of what the retiree received each month; a 100% JSA pays the beneficiary the same amount the retiree received. Unless they choose otherwise and obtain their spouses' consent, participants who are married when their benefits commence automatically receive a 50% JSA.

8.     To convert the SLA to the JSA, the Plans use formulas based on actuarial assumptions — consisting of an interest rate and mortality table — to determine the amount by which they reduce a participant's SLA to arrive at the monthly JSA benefit amount. A JSA recipient's monthly amount will generally be less than the amount he or she would receive as an SLA because pension plans must account for paying benefits for two lives (the retiree and his or her beneficiary) rather than one. This case concerns how Defendants unlawfully reduce participants' SLA to arrive at the monthly JSA amount.

9.     ERISA requires that JSA benefits that pay between 50% to 100% (also known as "Qualified Joint and Survivor Annuities" or "**QJSAs**") be at least the "actuarial equivalent" of the retiree's SLA. *See* 29 U.S.C. § 1055(d); *see also* § 1055(e) (discussing the qualified preretirement survivor annuity ("**QPSA**") and how

4

benefits must not be less than the amount which would be payable as a survivor annuity under a QJSA).

10.    Two benefit forms are actuarially equivalent when the present values of the two benefits are the same, based on reasonable actuarial assumptions. Calculating present value requires interest rates and mortality tables. Interest rates discount the value of expected future payments to the date of the calculation. Because of the time value of money, a dollar today is worth more than a dollar in the future because that dollar can be invested today and earn interest. As a result, to calculate the value of a benefit stream one must use a rate to discount the future payments to today's dollars. Mortality tables predict the rate at which retirees will die at any given age and, therefore, the chance they will receive an additional year of benefits. The interest rate and mortality table work together to generate a "conversion factor" that is applied to a participant's SLA. Once applied, the conversion factor reduces the SLA to arrive at an alternate benefit form. The actuarial assumptions used in the formula directly impact the conversion factor.

11.    For the last several decades, mortality rates have improved. Generally, retirees today live longer than retirees from the 1960s and 1970s. Accordingly, mortality tables based on data from the 1960s and 1970s predict that people will die earlier than contemporary mortality tables. All else being equal, using an antiquated mortality table to calculate a conversion factor decreases the present value of an

optional benefit form and, in turn, the monthly amount retirees receive. For example, a plan using a mortality table from the 1970s to calculate a 50% JSA — interest rates being equal — may produce a conversion factor of 0.90. In this scenario, a participant entitled to a monthly SLA benefit of $1,000 would receive $900 per month as a 50% JSA (his or her spouse would receive $450 per month). By contrast, a plan using a mortality table from 2023 — interest rates being equal — may produce a conversion factor of 0.93. The same retiree would receive $930 per month as a 50% JSA (his or her spouse would receive $465 per month).

12.    When plans make actuarial conversions from one benefit form to another or from normal retirement age to early retirement, ERISA's actuarial equivalence requirements apply. These statutory requirements, along with the associated Treasury regulations, ensure that, all else being equal, the forms of pension benefit that a retiree receives, and the time they receive those benefits relative to their normal retirement age, are *at least* as valuable as the SLA they would receive at normal retirement age. *See* ERISA §§ 205(d) and (e) and 204(c)(3), 29 U.S.C. §§ 1055(d) and (e) and 1054(c)(3); 26 C.F.R. § 1.401(a)-20, Q&A 16. ERISA's actuarial equivalence requirements are designed to ensure that married participants receiving JSAs and early retirees are not penalized for their choices, regardless of the optional form they select or when they retire.

13.     ERISA § 204(c)(3) requires that an employee's accrued benefit, if it "is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . shall be the actuarial equivalent of such benefit[.]" 29 U.S.C. § 1054(c)(3). Failing to provide a participant with at least the actuarial equivalence of his or her vested benefit results in an illegal forfeiture in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

14.     Defendants violate ERISA's actuarial equivalence requirements by using outdated formulas that produce unreasonably low conversion factors and, therefore, depress the value of JSAs and preretirement survivor annuities offered to participants of the Plans. Despite the considerable increases in life expectancy over the past decades, Defendants continue to use formulas based on antiquated actuarial assumptions to calculate pension benefits for participants. The formulas used by the Plans to determine JSAs produce conversion factors that are consistently lower than the conversion factors produced by contemporary actuarial assumptions, causing retirees who select JSAs and recipients of QPSAs to receive less than they would if Defendants used formulas based on current and reasonable actuarial assumptions.

15.     Defendants' use of formulas based on outdated actuarial assumptions to calculate participants' benefits violates ERISA's actuarial equivalence requirements and results in Plaintiff and the Class receiving less than they would if

Defendants used formulas based on reasonable and current assumptions required by ERISA and the accompanying Treasury regulations.

16.    The damage caused by Defendants' unlawful use of formulas based on unreasonable actuarial assumptions to calculate JSA and QPSA benefits has negatively affected and will continue to negatively affect Plaintiff and Class Members for the rest of their lives (and the lives of their spouses too).

17.    Plaintiff brings this action on behalf of a Class of retirees receiving JSAs between 50% and 100%, and QPSA recipients, pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). Plaintiff seeks all appropriate equitable relief, including but not limited to a declaration that the Plans' formulas for determining JSAs for retirees and QPSAs for their beneficiaries violate ERISA's actuarial equivalence and non-forfeitability requirements; an injunction requiring the Plans' fiduciaries to ensure that the Plans pay actuarially equivalent benefits to all Class members; an Order from the Court requiring Defendants to pay all amounts improperly withheld in the past and that they will withhold in the future; an Order requiring Defendants to recalculate Plaintiff's and the Class's JSA and QPSA benefits in accordance with ERISA's actuarial equivalence requirement; an Order requiring Defendants to increase the amounts of Plaintiff's and the Class's future benefit payments, and any other relief the Court determines to be just and equitable.

## II.   JURISDICTION AND VENUE

18.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for Federal jurisdiction of actions brought under Title I of ERISA.

19.   This Court has personal jurisdiction over Kellogg because it is headquartered in, transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides nationwide service of process.

20.   This Court has personal jurisdiction over the Plans because they offer and pay pension benefits to participants and beneficiaries in this District, and because ERISA provides nationwide service of process.

21.   This Court has personal jurisdiction over the Committees because they transact business in and have significant contacts with this District, and because ERISA provides nationwide service of process.

22.   This Court has personal jurisdiction over the individual members of the Committees because, upon information and belief, each transacts business in, resides in, and has significant contacts with this District and because ERISA provides nationwide service of process.

23.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District, Defendants employed Plaintiff Reichert and other Class members in this District, and otherwise does business in this District.

### III.   PARTIES

24.     Plaintiff Thomas N. Reichert resides in Climax, Michigan and is a participant in the BCTGM Plan. He worked for Kellogg for approximately 11 years. His benefits, which Defendants calculated using the Plans' unlawful formulas, began on June 1, 2019. Mr. Reichert elected the 50% JSA offered by the BCTGM Plan as a "Qualified" JSA with his wife as the beneficiary.

25.     Kellogg is a multinational food manufacturer headquartered in Battle Creek, Michigan, that produces cereals, crackers, and toaster pastries. Kellogg is the "plan sponsor" for the Plans within the meaning of § 3(16)(B), 29 U.S.C. § 1002(16)(B).

26.     The Plans are defined benefit plans within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The Plans are joined as nominal defendants pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted. Pursuant to 29 U.S.C. § 1102, the Plans were established and maintained pursuant to written instruments known as "Plan Documents."

27.   Upon information and belief, the Finance Committee is an unincorporated association based in Battle Creek, Michigan. The Finance Committee is a fiduciary for the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority or control respecting the management or disposition of assets of the Plans.

28.   Upon information and belief, the Administrative Committee is an unincorporated association based in Battle Creek, Michigan. The Administrative Committee is a fiduciary for the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority or control respecting the management or disposition of assets of the Plan.

29.   Upon information and belief, the BCTGM Committee is an unincorporated association based in Battle Creek, Michigan. The BCTGM Committee is a fiduciary for the BCTGM Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority or control respecting the management or disposition of assets of the BCTGM Plan.

30.   John/Jane Does 1 through 20, inclusive, are the individual members of the Committees responsible for administering the Plans throughout the relevant time period. Their names and identities are not currently known. Upon information and belief, each transacts business in, resides in, and has significant contacts with this District.

## IV.   <u>BACKGROUND</u>

### A. Actuarial Equivalence Under ERISA

31.    Actuarial equivalence is a "term of art" (*Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)), which "Congress intended [] to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). If "Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (citations omitted). "And so, it makes sense that when the 'appropriate methodology' for calculating an actuarially-equivalent value 'is not apparent from the face of the definition of actuarial equivalence, nor from the statute or regulations as in effect,' courts look 'to practice within the field of actuarial science.'" *Adams v. U.S. Bancorp*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 (D. Minn. Oct. 17, 2022) citing *Pizza Pro Equip. Leasing v. Comm'r*, 147 T.C. 394, 412 (2016), *aff'd*, 719 F. App'x 540 (8th Cir. 2018).

32.    At the heart of actuarial equivalence calculations is the concept of "***present value***." Actuarial equivalence describes two benefit streams as having equal present values. As the Court of Appeal for the D.C. Circuit explained: "Two modes of payment are actuarially equivalent when their ***present values*** are ***equal*** under a given set of assumptions." *Stephens*, 644 F.3d at 440 (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm.

12

of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield"). Relying on the Society of Actuary's definition of actuarially equivalent benefits, the *Stephens* court instructed that "within the actuarial field, 'actuarial equivalen[ce]' is understood to require a present-value calculation." *Adams*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 citing *Stephens*, 644 F.3d at 440.

33.    Present value is the value of a payment stream, on a specific measurement date, that is adjusted for the time value of money. The Society of Actuaries[1] defines the "Present Value" of a cash flow as the "value of a future cash flow given by a present value model under a particular set of assumptions about ***future economic or other conditions*** . . . ."[2]  In other words, present value is the amount that you would need to invest today at a given interest rate over a specified period in order to have an amount at the end of that period equal to a future amount.

34.    Like the Society of Actuaries, ERISA defines "present value" as "the value adjusted to reflect ***anticipated events***." ERISA § 3(27), 29 U.S.C. § 1002(27).

---

[1] The Society of Actuaries ("SOA") is a global professional organization for actuaries founded in 1949 that provides the exams, certifications, and continuing education necessary to practice as an actuary in the U.S.

[2] (Emphasis added), *see* Society of Actuaries, Glossary. Available at: https://www.soa.org/4a537f/globalassets/assets/files/edu/actuarial-glossary.pdf (last accessed September 12, 2023).

Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.*

35.    Calculating present value requires two primary ingredients: (1) an interest rate and (2) a mortality table. An interest rate discounts future dollars to the present. The rate is often called a "discount rate" because money available now is worth more than the same amount in the future — because it can be invested and earn interest. *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003). ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent."). A mortality table shows the rate of deaths occurring during a selected time interval and predicts the likelihood of death in an individual within the current year.[3]  Using discount rates and mortality tables, an actuary can determine whether two benefit forms (e.g., an SLA and JSA) are actuarially equivalent by comparing the present values.

36.    ERISA's actuarial equivalence requirements help ensure that pension plan participants receive at least the same value of monthly benefit regardless of the benefit form. The notion is that a participant should not be penalized for selecting one form of pension benefit over another.

---

[3] *See* Society of Actuaries, definition of "Mortality" *supra* note 2.

37.     Under ERISA, defined benefit plans must offer at least two payment options: one for married participants (i.e., JSAs) and one for unmarried participants (i.e., SLAs). However, a JSA could pay out for longer because plans make payments to the participant and, potentially, the beneficiary. Therefore, if the monthly payment to the participant remains the same, a JSA will be more expensive than an SLA because the beneficiary may also receive payments.

38.     To account for the additional value from a JSA, plan sponsors reduce the participant's SLA or the monthly amount he or she will receive. Plans use formulas based on actuarial assumptions to determine the amount of the reduction to the SLA. The actuarial assumptions generate a conversion factor that is applied to the SLA to determine the reduction in benefits to arrive at the JSA amount. To ensure plans do not shortchange participants and their beneficiaries on their JSA benefits, Congress required that JSAs be at least "actuarial[ly] equivalent" to the SLAs offered to non-married participants. *See* 29 U.S.C. § 1055(d); *see also* 26 U.S.C. § 417 (same requirement under the Tax Code). Accordingly, actuarial equivalence should be cost-neutral, whereby the "cost" to the plan should be the same regardless of the benefit the participant selects.

39.     ERISA's actuarial equivalence requirements impose duties on pension plans in form and timing. *See Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000) ("What these provisions [ERISA's actuarial equivalence provisions] mean in less

technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at *any other time* (e.g., on termination rather than retirement) or in *any other form* (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.") (Emphasis added.).

40.     With regards to the *form* of pension benefit, ERISA requires that qualified JSAs ("QJSAs") be at least the actuarial equivalent of the value of the SLA offered to the retiree at the times benefits commence. 29 U.S.C. § 1055(d)(1). The Tax Code repeats this definition at 26 U.S.C. § 417(b)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant") and § 417(g)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant").[4] A plan can offer multiple QJSAs ranging from 50% to 100%. 29 U.S.C. § 1055(d)(1).

41.     A plan must designate one of the QJSAs as the default option for married participants, which can be more valuable than the other QJSAs offered (26 C.F.R.§ 1.401(a)-20, Q&A 16) but must be *at least* the actuarial equivalent of the

---

[4] The Internal Revenue Code (the "Tax Code") has parallel provisions for ERISA's actuarial equivalence requirements, and the Treasury regulations provide further guidance into the rules. *See* 26 U.S.C. §§ 417(b)(2), 411(c)(3); *see also* 26 C.F.R. § 1.411(c)-1(e) (referring to the "actuarial equivalence" of the participant's accrued benefit in conformance with Treasury regulations).

SLA (29 U.S.C. § 1055(d)(1)). If the plan offers optional forms of benefit that are more valuable than the SLA, then the default QJSA must be of at least equal value to that benefit form. *See* 26 C.F.R. § 1.401(a)-20, Q&A 16. That way, married and unmarried participants have at least one form of benefit available to them that is equivalent to the most valuable benefit form.

42.     Under ERISA, plans must also offer a QPSA. *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity paid to the participant's surviving spouse if the participant dies before his or her benefits commence. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be at least the actuarial equivalent of the amount the spouse would have received if the participant had selected the plan's default QJSA and died. ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

43.     With regards to the ***time*** a retiree opts to start receiving benefits, ERISA requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]" § 204(c)(3), 29 U.S.C. § 1054(c)(3). ERISA defines "normal retirement age" as age 65, or younger if provided by the pension plan. ERISA § 3(24), 29 U.S.C. § 1002(24); *see also* 26 U.S.C. § 411(a)(8); Treas. Reg. § 1.411(a)–7(b). In other words, if a participant chooses to begin receiving benefits prior to the "normal

retirement age," the benefit must be at least the actuarial equivalent of the amount the retiree would have received as an SLA at the normal retirement age.

44.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is nonforfeitable. The Treasury regulation which "defines the term 'nonforfeitable' for purposes of these [non-forfeitability] requirements," 26 C.F.R. § 1.411(a)-4(a), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." Therefore, distributions of retirement benefits that are less than their actuarial equivalent value constitute an impermissible forfeiture under ERISA § 203(a), 29 U.S.C. § 1053(a).

### B. Actuarial Equivalence Requires Reasonable Assumptions

45.     Reasonable assumptions must underlie the actuarial computation of present value to achieve equivalence.[5] As discussed above, ERISA defines "present value" as "the value adjusted to reflect *anticipated events*. Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.* (emphasis added.)

---

[5] "To be equivalent means to be 'equal in force, amount, or value.' [Definition of] *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent. Only accurate and *reasonable actuarial assumptions* can convert benefits from one form to another in a way that results in equal value between the two." *Urlaub v. CITGO Petro. Corp.*, Docket No. 21 C 4133, 2022 US Dist. LEXIS 30616, at *19–20 (ND Ill. Feb. 22, 2022).

46.     The Treasury regulations repeatedly reference using reasonable assumptions when performing actuarial equivalence calculations. For example, the Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).  Likewise, the Treasury regulation discussing protected accrued benefits defines "[a]ctuarial present value" as meaning "determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added). Further, when making actuarial reductions to determine the early retirement benefits of terminated vested participants — which 29 U.S.C. § 1056(a)(3) governs — the corresponding Treasury regulations instruct plans to use "reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)-14(c)(2). It "would be strange for the [Treasury] Commissioner to provide greater protection to participants who were terminated before reaching minimum early-retirement age rather than those who are active." *Adams*, 2022 US Dist. LEXIS 188713, at *21.

47.     There is also a reasonableness requirement for lump-sum distributions. Indeed, within the context of cash balance plans, the regulations require optional forms of benefit to be actuarially equivalent "using reasonable actuarial assumptions." 26 C.F.R. § 1.411(a)(13)-1(b)(3). When comparing optional forms of benefits to a QJSA, plans must use either the "applicable" mortality table and interest

19

rates, which are "considered reasonable actuarial assumptions," or specify their own "reasonable interest rate and reasonable mortality table." 26 C.F.R. §§ 1.417(a)(3)-1(c)(2)(iv)(A)–(B) and (f)(ii)(2)(i)(A)–(B). As the court in *Adams* stated: "***A reasonableness requirement is consistent with ERISA's structure and purpose***." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *21 (emphasis in original).

48.    The American Academy of Actuaries (the "**Academy**"), a professional organization that represents and unites actuaries in all practice areas, similarly requires using reasonable actuarial assumptions. In 1988, the Academy created the Actuarial Standards Board ("**ASB**"), which promulgates standards of practice for the entire profession in the United States. The ASB issues actuarial standards of practice ("**ASOPs**") that discuss how each demographic (i.e., mortality) and economic (i.e., interest rate) assumption that an actuary selects must be reasonable. *See* ASOP Nos. 35 and 27.

49.    The ASOPs, published by the ASB, dictate that "each economic assumption used by an actuary should be reasonable." *See* ASOP 27, para. 3.6. An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

50.     ASOP 35, discussing Demographic and Other Noneconomic Assumptions, explains that an actuary "should select reasonable demographic assumptions in light of the particular characteristics of the defined benefit plan that is the subject of measurement."[6] Para. 3.3.5 — titled "Select a Reasonable Assumption" — echoes this idea and states that an assumption is reasonable if it "reflects the actuary's professional judgment," "takes into account historical and current demographic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience."  *Id.* (emphasis in original).

51.     Courts have also signaled that plans should use reasonable actuarial assumptions to calculate pension benefits. *See Smith v. Rockwell Automation, Inc.*, 438 F. Sup. 3d 912, 921 (ED Wis. 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination"); *Masten v. Metropolitan Life Ins. Co. Empl. Bens. Committee*, 543 F. Sup. 3d 25, 33 (SDNY 2021) ("the Court finds it plausible that the Plan's use of decades-old mortality tables is not a 'reasonable' actuarial assumption in light of the ready availability of updated alternatives . . . the Court concludes that ***ERISA requires that Plan administrators use reasonable actuarial assumptions when***

---

[6] See ASOP 35, Section 3 Analysis of Issues and Recommended Practices. Available at: https://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/ (last accessed May 22, 2023).

*converting SLAs into alternative benefits*" (emphasis added); *Urlaub,* 2022 US Dist. LEXIS 30616, at *19 ("it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions"); *Dooley v. Am. Airlines, Inc.*, No. 81-C-6770, 1993 US Dist. LEXIS 15667, 1993 WL 460849, at *11 (ND Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means *equal in value* to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are *reasonable* . . . .") (emphasis added).

52.    The assumptions pension plans use to determine actuarial equivalence are not reasonable simply by being expressed in the plan document. *See Laurent v. Pricewaterhouse Coopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) ("ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit"); *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence'").

## V.    FACTUAL ALLEGATIONS

### A. The Plans

#### 1.    The Kellogg Company Pension Plan

53.    Kellogg established the Plan on November 1, 1975, which is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C.

§ 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

54.     Participants in the Plan are current and former salaried and certain hourly employees of Kellogg, or its subsidiaries and affiliates, and the beneficiaries of deceased participants. As of January 1, 2010, new salaried and certain non-hourly employees are not eligible to participate in the Plan. Based on data from the most recently filed public documents, the Plan has 3,832 Participants and Beneficiaries receiving payments from the Plan; there are 3,856 active participants as of January 1, 2021.   *See* Form 5500 for the Plan (2021).

55.     The Plan is administered by the Finance Committee and the Administrative Committee.

56.     The Plan consists of a legacy portion as well as several sub-parts from former defined benefit plans that merged into the Plan over the past 25 years, including the Eggo Waffle Plan and the Keebler Pension Plan.

57.     Under the Plan, participants earn a pension in the form of an SLA that begins at age 65. Benefits are based on an accrual rate multiplied by the participant's years of credited service.   The Plan provides that the normal form of benefit for unmarried participants is an SLA.[7] For married participants, the normal form of

---

[7] Except participants in the Grand Rapids Hourly subpart of the Plan who earn pension benefits in the form of a 10-year certain and life annuity.

benefit is a 50% JSA. The Plan also provides participants with other QJSA benefit forms including a 75% and 100% JSA, as well as a 10-year certain and life annuity. In 2021, the Plan began offering employees an actuarially equivalent lump sum.

58.     Additionally, the Plan provides for a death benefit for participants who die after attaining five years of service but before they begin receiving benefits (i.e., a QPSA). The Plan computes death benefits as if the employee retired on the day before death and benefits are paid as a 50% JSA. Benefits can commence on the latter of the date of death or the date the participant would have attained age 55.

59.     Upon information and belief, the various subparts of the Plan use different formulas for calculating pension benefits for participants who receive QJSAs and QPSAs. Plaintiff is currently unaware of the exact formulas utilized in each subpart of the Plan to calculate QJSAs and QPSAs, but alleges that the conversion factors, or the actuarial assumptions used to produce the conversion factors, are unreasonable. For example, the Keebler sub-part uses the UP-1984 mortality table with joint annuitant ages set back three years,[8] and 7% interest rate.

---

[8] A "setback" is a method of adjusting mortality rates by assuming a participant or beneficiary will have the same mortality rates as someone younger than them. For example, a 3-year setback for a 65-year-old will assume the person has the mortality rate of a 62-year-old.

## 2. *The Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Plan*

60.    Kellogg established the BCTGM Plan on October 1, 1975, which is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

61.    Participants in the BCTGM Plan are employees who are members of the Bakery, Confectionery, Tobacco Workers and Grain Millers Union Local Nos. 3G, 50G, 252G, 374G, and 401G. Based on data from the most recently filed public documents, the Plan has 3,884 Participants and Beneficiaries receiving payments from the Plan; there are 1,369 active participants as of January 1, 2021. *See* Form 5500 for the BCTGM Plan (2021).

62.    The BCTGM Plan is administered by the Finance Committee and the BCTGM Committee.

63.    Under the BCTGM Plan, participants earn a pension in the form of an SLA that begins at age 65. Benefits are based on a negotiated amount for each year of credited service. The BCTGM Plan provides that the normal form of benefit for unmarried participants is an SLA. For married participants, the normal form of benefit is a 50% JSA. The BCTGM Plan also provides participants with other QJSA benefit forms including a 75% and 100% JSA, as well as a 10-year certain and life annuity.

25

64.     The BCTGM Plan also provides for a death benefit for participants who die after attaining five years of service but before they begin receiving benefits (i.e., QPSA). The BCTGM Plan computes death benefits as if the employee retired on the day before death and benefits are paid as a 50% JSA. Benefits can commence on the latter of the date of death or the date the participants would have attained age 55.

65.     Plaintiff is currently unaware of the exact formulas used by the BCTGM Plan to calculate QJSAs and QPSAs, but alleges that the conversion factors, or the actuarial assumptions used to produce the conversion factors, are unreasonable.

66.     The assets of the BCTGM Plan and the Plan are pooled and held in a Master Trust, which Kellogg established to invest the Plans' assets.

### B. The Plans' QJSAs and QPSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements

67.     As discussed, Plaintiff is currently unaware of the precise formulas used by the Plans to calculate JSAs and QPSAs but alleges that those forms of benefit are not actuarially equivalent to the SLA the Plans offer to participants.

68.     Under ERISA, Kellogg must state the formulas used in the plan documents for the Plans. The plan documents will show that the formulas used by the Plans to calculate these forms of benefit are unreasonable and likely based on outdated actuarial assumptions that do not reflect the economic conditions or

mortality rates of participants at the time they retired. The use of antiquated interest rates and mortality tables is unreasonable and unlawful under ERISA.

### C. The Formulas Used To Determine Actuarial Equivalence Must Be Reasonable When The Benefits Are Calculated

#### 1.    Reasonable Discount Rates

69.    The Treasury is a reliable source for a "reasonable" discount rate for any given year. The Treasury regularly updates the discount rate, known as the "applicable interest rate." According to the Treasury, pension plans should use discount rates that reflect the actuary's "best estimate," anticipated future events, and economic data as of the measurement date. The "applicable interest rate" is based on corporate bond yields and is updated throughout the year.

70.    The applicable interest rate is a yield curve. Yield curves provide for different rates depending on when future payments are made. The applicable interest rate is based on the first, second, and third Segment Rates. *See* 26 U.S.C. §§ 417(e)(3)(C) and 430(h)(2)(C).  The Segment Rates are determined using yields on corporate bonds with maturities of 0 to 5 years, 5 to 20 years, and beyond 20 years. The Segment Rates are appropriate benchmarks for pension plans because the maturity rates closely correspond to the time period over which a pension plan will pay its retirees. The following shows the IRS Segment Rates over the past six years:

| Year | 417(e) Segment Rates for March | Effective Rate |
| --- | --- | --- |

| 2023 | 5.00% / 5.20% / 5.15% | 5.11% |
| 2022 | 2.44% / 3.71% / 3.94% | 3.36% |
| 2021 | 0.69% / 2.92% / 3.69% | 2.43% |
| 2020 | 2.22% / 3.08% / 3.73% | 3.01% |
| 2019 | 2.86% / 4.00% / 4.42% | 3.76% |
| 2018 | 2.91% / 3.99% / 4.43% | 3.77% |
| 2017 | 2.06% / 3.95% / 4.75% | 3.58% |

71.     Defined benefit plans use the "applicable interest rate" to calculate the present values of lump sum benefits. Section 417(e) of the Tax Code provides that a pension plan can offer a lump sum benefit. However, the present value of the lump sum must be at least equal to the present value calculated using the "applicable mortality table" and "applicable interest rate" (collectively referred to as the "**Treasury Assumptions**"). *See* 26 U.S.C. § 417(e)(3). While a plan can subsidize a lump sum benefit, the applicable interest rate (coupled with the applicable mortality table) sets a "floor" for the present value below which a lump sum cannot go.

72.     Indeed, for providing the relative value of all benefit forms, including JSAs, the applicable interest rate is *per se* reasonable for actuarial equivalence purposes. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B).

### 2.     *Reasonable Mortality Tables*

73.     Mortality tables show the probability of death for a specific group of individuals or population groups. Pension plans use mortality tables to estimate the probability of a participant dying before they receive another year of benefits.

28

Mortality is a key assumption in determining benefits and liabilities that should represent the "best estimate" of the expected duration of future benefit payments.

74.     Mortality tables for pension plans should be updated regularly to reflect changes in life expectancy. Indeed, "plan management should consider the specific demographics of their plan when evaluating the appropriate mortality or other assumptions to use, as well as relevant available mortality data. . . . *[management]* *should consider any published new mortality data for their plans in relation to* *their plan-specific mortality experience and future expectations*."[9]

75.     Several organizations publish mortality tables used by pension plans, but the primary source is the SOA. The Retirement Plan Experience Committee ("RPEC") of the SOA publishes the mortality tables upon which many pension plans across the country rely. The SOA bases its mortality tables on "experience studies" that measure the actual mortality experience of pension plan participants in the United States.

76.     These "experience studies" were the basis for the mortality tables published by the SOA in 1971 ("**71 GAM"),** 1976 (the "**UP-84**"), 1983 (the "**1983**

---

[9] (Emphasis added) PWC, US Pensions Guide, Defined benefit plan financial statements, § 9.4.4, June 30, 2022. Available at: https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/pensions-and-employee-benefitspeb/peb_guide/Chapter-9-PEB/94_Defined_benefit_plan_financial_statements_8.html (last accessed September 1, 2023).

GAM"), 1994 (the "**1994 GAR**"), 2000 (the "**RP-2000**"), 2014 ("**RP-2014**") and 2019 (the "**Pri-2012**"). Periodically, the tables are updated to account for changes in the mortality experience of US workers over the years. The SOA generally releases new mortality tables, or a series of tables, a few years after the corresponding data group they are named after. For example, the SOA released the RP-2000 mortality tables in 2000 based on the mortality experience of pension plan participants from 1990–1994.

77.   For the past 50 years, the SOA's experience studies show a steady upward trend in life expectancy. Retirees in the last 15 years live longer than retirees in the 1970s and 1980s. A study that the SOA published in 2014 indicated that the RP-2000 mortality tables "no longer reflect the actual mortality experience of pension plan participants and projected trends in that experience."[10] When the SOA released the RP-2014 mortality tables, the managing director for the SOA predicted that the update would increase liabilities for pension plans between 4% and 8%.[11] The increase in liabilities spurred Moody's to conclude that plan sponsors would have to divert $110 billion to their pension plans over seven years to fund additional

---

[10] Mortality Tables for Determining Present Value Under Defined Benefit Pension Plans, 26 C.F.R. 1, 82 FR 46388, 46397.

[11] *See* Society of Actuaries Pledges Faster Mortality Scale Updates, available at: https://www.plansponsor.com/society-of-actuaries-pledges-faster-mortality-scale-updates/ (last accessed September 1, 2023)

liabilities.[12] The chart below shows the increase in life expectancy over the last few

decades and the corresponding impact on plan liabilities:



See Plaintiff's Expert Report, *Rockwell v. Berube*, No. 20-cv-01783, ECF No. 55-5

at 18.

78.    As the graph above demonstrates, a 70-year-old today is expected to

live roughly 30% longer than a 70-year-old retiree in the 1980s. It is improper for a

pension plan to use a 50-year-old mortality table to calculate a retiree's benefits in

2019 because antiquated mortality assumptions fail to account for the improvements

---

[12] *Id.*

in life expectancy over the past few decades. For example, the SOA released the UP-84 — comparable to the GAM 71 shown above — in 1976. Data collected from 1965–1970, now **over 50 years old**, form the basis of the UP-84. In the last 50 years, there have been substantial improvements in lifestyle habits and healthcare, which lowered the mortality rates of pensioners. The UP-84, like other outdated mortality tables, does not account for these improvements.

79.     A benchmark for reasonable mortality rates is the mortality assumption released by the Treasury. Like discount rates, the Treasury also releases the "applicable mortality table," based on the most up-to-date SOA mortality tables. When prescribing the applicable mortality tables, the Secretary must consider the "results of available independent studies of mortality of individuals covered by pension plans."[13] *Id.* In other words, the IRS defers to the SOA when it comes to the mortality rates of pensioners.

80.     Plan sponsors must make minimum contributions to their pension plans, and the Treasury prescribes the tables that plans should use. For plan years beginning on or after January 1, 2023, the Treasury regulations prescribe the use of mortality tables based on the Pri-2012 Report,[14] which is based on RPEC's

---

[13] 87 FR 25161, 25162.

[14] *See* IRS Notice 2022-22; *see also* 87 FR 25161, 25163.

experience study for the period 2005–2014 and is the best available study of the actual mortality experience of pensioners.[15] The "applicable mortality table" must be updated (at least every ten years, but, in practice, the Treasury updates the rates more frequently) and "must be based on the actual experience of pension plans . . . ." 26 U.S.C. § 430(h)(3)(A).

81.    For measuring pension plan liabilities, plan sponsors can apply to use plan-specific mortality tables that more accurately reflect the experience of a given plan's participants. *See* 26 U.S.C. § 430(h)(3)(C). If a plan has enough participants and has been around long enough, it can apply to the IRS to use company-specific mortality tables based on the experience of the plan's participants to determine present values under § 430. Similarly, plans can use separate mortality tables for disabled participants because disabled participants generally have different mortality rates from healthy pensioners. *See* 26 U.S.C. § 430(h)(3)(D). Like the plan-specific tables, mortality tables used for disabled participants must be periodically updated. Through its regulatory guidance, the Treasury believes that it is important to regularly update mortality tables used by pension plans to ensure that they are accurate and reflect the latest mortality trends.

---

[15] *See* 87 FR 25161, 25163.

82.     As discussed, the Treasury Assumptions, including the applicable mortality table, are *per se* reasonable for determining the present values of different benefit forms. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### D. The Plans' Formulas for Calculating Survivor Annuities and Preretirement Survivor Annuities Do Not Satisfy ERISA

83.     Throughout the relevant period, the Plans used unreasonable formulas to determine JSA and QPSA benefits for participants and their beneficiaries.

84.     Using these formulas was and continues to be unreasonable because they do not reflect the economic conditions on the participants' measurement dates (i.e., the dates Defendants determined their benefits). Similarly, the mortality rates underlying the formulas do not reflect the experience of the participants or pensioners in general, let alone future "anticipated events" (i.e., the anticipated mortality rates of pensioners).

85.     The unreasonably low conversion factors produced by the Plans' formulas result in JSA benefits that violate ERISA's actuarial equivalence requirements. The JSA benefits produced using these formulas are not at least actuarially equivalent to the SLA that participants were offered when their benefits started. Accordingly, Plaintiff and the Class are receiving substantially less each month than they would have if the Plans had used reasonable formulas.

86.     The conversion factors produced by these assumptions, when calculating JSAs and QPSAs are unreasonably low compared to the conversion

factors produced using reasonable assumptions. The following chart shows a comparison of the conversion factors using the BCTGM Plan's assumptions and the conversion factors using the § 417(e) assumptions, with a November lookback, from the time Plaintiff Reichert's benefits began:

| Year | Benefit Form | The Plan's Conversion Factors | Monthly Amount Using Conversion Factors Produced by Plan Formula | Conversion Factors Produced Using Treasury Assumptions | Monthly Amount Using the Treasury Conversion Factors | Percent Difference in Benefit Amount |
|------|--------------|-------------------------------|------------------------------------------------------------------|--------------------------------------------------------|------------------------------------------------------|--------------------------------------|
|      | SLA          | N/A                           | $1,000.00                                                        | N/A                                                    | $1,000.00                                            | N/A                                  |
| 2019 | 50% JSA      | 0.8350                        | $835.00                                                          | 0.8918                                                 | $891.80                                              | **6.3%**                             |
|      | 75% JSA      | 0.7713                        | $771.30                                                          | 0.8460                                                 | $846.00                                              | **8.8%**                             |
|      | 100% JSA     | 0.7167                        | $716.70                                                          | 0.8047                                                 | $804.70                                              | **10.9%**                            |

87.   The chart above demonstrates that Defendants' use of unreasonable and unlawful formulas results in a substantial difference in monthly income.

88.   Plaintiff Reichert began collecting benefits under the Plan on June 1, 2019. He accrued and was offered an SLA that would have paid him $455.69 per month. He selected the 50% JSA, which pays $380.50 per month. If the November 2018 Treasury Assumptions were used to calculate his benefits, Plaintiff Reichert's benefit would be approximately $406.39 or $25.89 more per month. By using an unreasonable formula, likely based on outdated actuarial assumptions that produce unreasonably low conversion factors, instead of reasonable, current actuarial

assumptions like the Treasury Assumptions, Defendants reduced the present value of Plaintiff Reichert's benefits by approximately $4,706 (past damages of $1,320.39 and future damages of $3,385.61).

### E. The Plans Use Updated Actuarial Assumptions for Other Purposes

89.    Defendants regularly update the actuarial assumptions used for determining the present value of the Plans' pension benefit obligation ("PBO"). The PBO is the present value of all future pension payments that a plan must make. The PBO is a liability on a company's balance sheet, and, therefore, public companies like Kellogg must disclose their PBO to investors in their annual 10-K filings with the SEC. If determining pension benefits is one side of the actuarial calculation coin, the other side would be determining a plan's PBO. Like calculating pension benefits, plan sponsors use formulas based on actuarial assumptions to calculate a plan's PBO. The actuarial assumptions underlying the Plan's PBO must be reasonable to report the Plan's PBO to Kellogg's shareholders accurately.

90.    Defendants are well aware of the requirement to regularly update the assumptions used to calculate its PBO. Indeed, Kellogg develops the discount rate for measuring the Plans' PBO based on "a cash-flow matching analysis using [its actuary's] Willis Towers Watson's proprietary RATE:Link tool and projections of the *future benefit payments* constituting the projected benefit obligation for the

plans."[16] These rates, which are consistent with standard indices such as the Citigroup Pension Liability Index and Mercer Above Mean Curve, are used as benchmarks to determine the discount rate to use. As the company stated, "we select yield curves to measure our benefit obligations that are consistent with market indices during December of each year."[17] Kellogg used the following discount rates to determine the present value of the Plan's liabilities:

| Year | Discount Rate |
|------|---------------|
| 2022 | 5.3% |
| 2021 | 2.6% |
| 2020 | 2.2% |
| 2019 | 2.9% |
| 2018 | 3.9% |
| 2017 | 3.3% |
| 2016 | 3.6% |

91.    Kellogg actively takes steps to ensure that the present value of the Plans' liabilities is as accurate as possible. In 2016, Kellogg changed the method it used for estimating service and interest costs related to its pensions from a single weighted-average discount rate to a full yield curve. The full yield curve approach operates "by applying specific spot rates along the yield curve used to determine the benefit obligation of relevant projected cash outflows."[18] Kellogg made the switch

---

[16] *See* Kellogg's Form 10-K for the fiscal year ending December 31, 2022, at 77.

[17] *Id.*

[18] Kellogg's Form 10-K for the fiscal year ending December 30, 2017, at 95

because the new method provided "a more precise measurement of service and interest costs by aligning the timing of the plan's liability cash flows to the corresponding spot rate on the yield curve."[19] In other words, Kellogg made the change because it wanted a more precise way of measuring the Plans' liabilities.

92.    Kellogg also regularly updates the mortality tables to calculate the Plans' PBO. In Kellogg's most recent 10-K, the company stated:

> *Assumed mortality rates of plan participants are a critical estimate in measuring the expected payments a participant will receive over their lifetime and the amount of expense we recognize*. In 2019, the Society of Actuaries (SOA) published updated mortality tables and an updated improvement scale. In 2021, the SOA released an improvement scale that incorporated an additional year of data. In 2022, the SOA did not release an updated improvement scale. *In determining the appropriate mortality assumptions as of 2022 fiscal year-end, we used the 2019 SOA tables with collar adjustments based on Kellogg's current population*, consistent with the prior year.[20]

93.    Similarly, in its 10-K for the fiscal year ending December 30, 2017, Kellogg stated "[a]t the end of 2014, the Company revised its mortality assumptions after considering the [SOA's] updated mortality tables and improvement scale, as well as other mortality information . . . to *develop assumptions aligned with the*

---

[19] *Id.*

[20] Kellogg's Form 10-K for the fiscal year ending December 31, 2022, at 49.

*company's expectation of future improvement rates*."[21]  With each new release of

an updated mortality table, Kellogg updated the mortality assumption used to

calculate the Plans' liabilities. Thus, when it comes to determining the present value

of the Plans' *liabilities*, Defendants regularly update the actuarial assumptions used

to ensure they reflect the conditions at the time the liability is measured.

Inexplicably, however, Kellogg failed to make the same updates to the formulas used

to calculate optional benefit forms for participants in the Plans.

94.     There is no reasonable explanation for why the Plans use different

assumptions to calculate JSA benefits for participants and the associated liabilities.

These determinations involve the same lives and, accordingly, updated assumptions

should be used for both benefit and liability determinations. Defendants have been

causing significant financial harm to Plaintiff and Class Members by employing

outdated and unreasonable formulas to calculate benefits, despite having no lawful

reason to do so.

95.     Defendants' use of unreasonable formulas, likely based on outdated

actuarial assumptions, for calculating participants' benefits results in Plaintiff and

the Class Members receiving significantly less than the total amount of benefits to

which they are lawfully entitled under ERISA.

---

[21] Kellogg's Form 10-K for the fiscal year ending December 30, 2017, at 95 (emphasis added).

## VI.    CLASS ACTION ALLEGATIONS

96.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of himself and the following class (the "Class"):

> All participants and beneficiaries of the Plans who (1)
> accrued benefits in the form of an SLA, (2) began
> receiving benefits on or after six years prior to the date this
> Complaint is filed, (2) are receiving a JSA with a survivor
> benefit of at least 50% and no more than 100% of the
> benefit paid during the participant's life, or are receiving a
> QPSA, and (3) are receiving a benefit where the actuarial
> present value of their annuity as of the date benefits began
> was less than the actuarial present value of their Normal
> Retirement Age SLA using the applicable Treasury
> Assumptions as of the date benefits began. Excluded from
> the Class are Defendants and any individuals who are
> subsequently determined to be fiduciaries of the Plans.

97.    The Class members are so numerous that joinder of all members is

impractical. The Class includes hundreds of individuals. Based on government

filings, as of January 1, 2021, over 3,856 participants and beneficiaries were

receiving benefits under the Plan and 3,884 participants and beneficiaries were

receiving benefits under the BCTGM Plan.

98.    Plaintiff's claims are typical of Class Members' claims because they

arise out of the same policies and practices as alleged herein, and all Class Members

are similarly affected by Defendants' wrongful conduct. Plaintiff and all Class

Members seek identical remedies under identical legal theories, and Plaintiff's

claims do not conflict with the interests of any other members of the Class in that

the Plaintiff and the other members of the Class were subject to the same conduct and suffered the same harm.

99.     There are questions of law and fact common to the Class, which predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      A. Whether the actuarial assumptions used to determine the value of participants' JSAs and QPSAs are unreasonable;

      B. Whether the actuarial assumptions used to determine the value of participants' JSAs violate the actuarial equivalence requirements of ERISA;

      C. Which actuarial assumptions would produce a reasonable conversion factor to apply to Plaintiff's and Class Members' SLA to satisfy ERISA's actuarial equivalence requirements;

      D. Whether the actuarial assumptions used by the Plans to calculate participants' benefits caused harm to Plaintiff and Class Members;

      E. Whether the Committees violated their fiduciary duties of loyalty and prudence under ERISA;

      F. Whether the Committees should be enjoined from applying the Plans' formulas for calculating participants' JSAs and QPSAs and instead be required to calculate benefits for Plaintiff and Class Members based on reasonable actuarial assumptions; and

      G. Whether Plaintiff and the Class should receive additional benefits.

100.   Plaintiff will fairly and adequately represent the Class because Plaintiff has no interests antagonistic to those of other members of the Class, and the

adjudication of his claims will necessarily decide the identical issues for all other Class Members. Plaintiff is committed to the vigorous prosecution of this action.

101. Plaintiff has retained counsel competent and experienced in ERISA and class action litigation.

102. Plaintiff does not anticipate any difficulty in management of this matter as a class action.

103. The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

104. The requirements of Rule 23(b)(1)(B) are satisfied because prosecution of separate actions by the members of the Class would create a risk of adjudications for individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

105. Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief for the Class as a whole.

106. Individual Class Members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because

the equitable relief sought by any Class Member will either inure to the benefit of the Plan or affect each Class Member equally. If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy because the damages suffered by each individual Class Member is relatively modest compared to the expense and burden of individual litigation. It would be impracticable for each Class Member to seek redress individually for the wrongful conduct alleged herein. There will be no difficulty in the management of this litigation as a class action as the legal issues affect standardized conduct by Defendants and class actions are commonly used in such circumstances. Furthermore, since joinder of all members is impracticable, a class action will allow for an orderly and expeditious administration of the claims of the Class and will foster economies of time, effort and expense.

### VII.    CAUSES OF ACTION

**COUNT I: VIOLATION OF ERISA'S JSA**
**ACTUARIAL EQUIVALENCE REQUIREMENT**
**(ERISA § 205, 29 U.S.C. § 1055)**

107. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

108.   The Plans improperly reduce participants' JSA and QPSA benefits below what they would receive if those benefits satisfied ERISA's actuarial equivalence requirements.

109.   ERISA § 205(d), 29 U.S.C. § 1055(d) requires plans to provide QJSAs that are "the actuarial equivalent of a single annuity for the life of the participant." Similarly, the applicable Treasury regulations state that plans must provide QJSAs that are "at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan . . . determined, on the basis of consistently applied ***reasonable actuarial factors***[.]" 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).

110.   Because the Plans use unreasonable formulas, likely based on outdated, unreasonable actuarial assumptions, to calculate participants' benefits, the JSA and QPSA benefits they receive (and their beneficiaries receive) are not actuarially equivalent to the SLA Defendants offered them.

111.   Defendants' use of unreasonable formulas to calculate these benefits is a violation of ERISA at Section 205(d), 29 U.S.C. § 1055(d).

112.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate

equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

113.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1055(d), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT II: VIOLATION OF ERISA'S EARLY RETIREMENT ACTUARIAL EQUIVALENCE REQUIREMENT (ERISA § 204, 29 U.S.C. § 1054)

114.   Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

115.   The Plans' formulas for calculating participants' JSA and QPSA benefits are based on unreasonable formulas that produce monthly benefits that are less than the actuarial equivalent of the participant's SLA at Normal Retirement Age, in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

116.   ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3) requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]"

117.   Through the use of formulas based on antiquated and unreasonable actuarial assumptions, Plaintiff and members of the Class who began receiving JSA

and QPSA benefits before Normal Retirement Age had their benefits improperly reduced and are not receiving benefits that are actuarially equivalent to their Normal Retirement Age SLA.

118.   Defendants' use of unreasonable formulas to calculate these benefits is a violation of ERISA at § 204, 29 U.S.C. § 1054.

119.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

120.   Pursuant to ERISA §§ 502(a)(3), 29 U.S.C. §§ 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1054(c)(3), including but not limited to the relief set forth below in the Prayer for Relief.

## COUNT III: VIOLATION OF ERISA'S ANTI-FORFEITURE RULES
## (ERISA § 203, 29 U.S.C. § 1053)

121.   Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

122.   The Plans use formulas based on unreasonable formulas, likely based on outdated actuarial assumptions, which produce monthly benefits for participants who receive JSAs and QPSAs that are less than the actuarial equivalent of their SLA

at Normal Retirement Age, causing an illegal forfeiture of benefits in violation of ERISA 203(a), 29 U.S.C. § 1053(a).

123.   Section § 203(a) of ERISA, 29 U.S.C. § 1053(a) establishes "an employee's right to his normal retirement benefit is non-forfeitable[.]" The applicable Treasury regulation states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

124.   By using unreasonable formulas to determine these benefits, Defendants underestimate the value of the benefits that participants have accrued, resulting in benefits that are not actuarially equivalent to the SLA at Normal Retirement Age and, therefore, causing an impermissible forfeiture.

125.   Defendants' use of unreasonable formulas as set forth herein is a violation of § 203, 29 U.S.C. § 1053.

126.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

127.   Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's non-forfeitability requirements outlined in § 203(a), 29 U.S.C. § 1053(a), including but not limited to the relief in the Prayer for Relief.

## COUNT IV: BREACHES OF FIDUCIARY DUTY
## (ERISA § 404, 29 U.S.C. § 1104)

128.   Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

129.   During all relevant times, the Committees were acting fiduciaries of the Plans and were responsible for paying benefits in accordance with ERISA's requirements and the Plans' terms, unless those terms themselves violated ERISA.

130.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), imposes several fiduciary duties on Plan Administrators, including the duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence" — which includes ensuring that benefits paid pursuant to a defined benefit plan conform with ERISA's statutory requirements — and the duty to act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with* the provisions of" subchapters I and III of ERISA. 29 U.S.C. § 1104(a)(1) (emphasis added).

131.   Here, the Committees and their members are fiduciaries for the Plans because they exercise discretionary authority or discretionary control respecting the management of the Plans as well as authority and control over the disposition of the Plans' assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They had authority or control over the amount and payment of JSAs and QPSAs from the Plans' assets.

132.    The Committees breached these fiduciary duties by administering Plans that did not conform with ERISA's actuarial equivalence requirements. The Committees acted disloyally by causing Plaintiff and the Class to receive benefits that were not actuarially equivalent to their SLAs at Normal Retirement Age thereby enabling Kellogg, as Plan Sponsor, to retain additional money by reducing the minimum amount it was required to contribute to the Plans.

133.    The Committees failed to act prudently and diligently by failing to sufficiently review the terms of the Plans, including the formulas used to calculate participants' optional benefit forms. This caused Plaintiff and the Class to receive less than the full value of their ERISA-protected accrued benefit. Further, the Committees failed to update the unreasonable formulas used to determine participants' benefits despite updating the assumptions used to calculate the Plans' PBOs.

134.    The Committees' breaches, as set forth herein, caused participants to forfeit a portion of their accrued benefit.

135.    ERISA requires fiduciaries who appoint other fiduciaries to monitor their actions to ensure they comply with ERISA. Kellogg therefore had a fiduciary duty to monitor the actions of the Committees to ensure they complied with ERISA.

136.   Kellogg breached its fiduciary duties to supervise and monitor the Committees by allowing them to pay benefits that were not actuarially equivalent, which is a violation of ERISA.

137.   As a direct and proximate result of these fiduciary breaches, Class members lost millions of dollars in vested accrued pension benefits.

138.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

139.   Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's fiduciary duties outlined in § 404(a)(1), 29 U.S.C. § 1104(a)(1), including but not limited to the relief set forth below in the Prayer for Relief.

## VIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.   An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative, and appointing the undersigned to act as Class Counsel;

B.      A declaratory judgment that the formulas used by the Plans for determining JSAs and QPSAs violate ERISA's joint and survivor annuity requirements set forth in § 205(d), 29 U.S.C. § 1055(d);

C.      A declaratory judgment that the formulas used by the Plans for determining benefits prior to Normal Retirement Age violate ERISA's actuarial equivalence requirement set forth in § 204(c)(3), 29 U.S.C. § 1054(c)(3);

D.      A declaratory judgment that the formulas used by the Plans for determining benefits prior to Normal Retirement Age violate ERISA's anti-forfeiture provision at § 203(a), 29 U.S.C. § 1053(a);

E.      A declaratory judgment that the Committees breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following terms of the Plans that violated ERISA and for failing to pay benefits to participants in conformance with ERISA's actuarial equivalence and anti-forfeiture requirements outlined in §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

F.      A declaratory judgment that Kellogg breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, failing to adequately monitor the Committees in the execution of their fiduciary duties;

G.     An Order requiring Defendants to provide an accounting of all prior payments of benefits to the Class under the Plans for which the unreasonable formulas were used to determine JSA and QPSA benefits, and provide information to recalculate those payments to Class members in compliance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

H.     Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plans and ordering Defendants to pay future benefits to participants in accordance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

I.     Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

J.     Restitution of all amounts Defendants kept in the Plans but were obliged to pay to Plaintiff and other Class Members in accordance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

K.    Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of the violations of ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

L.    Relief to the Plans from the Committees for their violations of ERISA § 404, 29 U.S.C. § 1104, including a declaration that the formulas used to determine JSAs and QPSAs violate ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a); restoration of losses to the Plans and its participants caused by the Committees' fiduciary violations; disgorgement of any benefits and profits the Committees received or enjoyed from the use of the Plans' assets or violations of ERISA; surcharge; payment to the Plans of the amounts owed to Class Members caused by fiduciary breach so that those amounts owed can be provided to participants of the Plans; and all appropriate injunctive relief, such as an order requiring the Committees to pay all participants fully ERISA-compliant benefits in the future and to ensure that all benefits they pay to participants conform to the requirements set forth in ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

M.   An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

N.   An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.   Any other relief the Court determines is just and proper.

**SIRI & GLIMSTAD LLP**

/s/ *Allison R. Lucas*
Allison R. Lucas (MI Bar #: P73331)
Lisa R. Considine (application for admission to be filed)
Oren Faircloth (application for admission to be filed)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: alucas@sirillp.com
E: lconsidine@sirillp.com
E: ofaircloth@sirillp.com

*Attorneys for Plaintiff*