# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| Thomas N. Reichert, Stuart R. Buck, and Kenneth A. Henrich on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Kellanova f/k/a/ Kellogg Company, WK Kellogg Company, the Administrative Committee of the Kellanova Pension Plan, the Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Committee, and John/Jane Does 1–20,<br><br>Defendants. | **Civil Action No.: 2:23-cv-12343-BAF-CI**<br><br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Thomas N. Reichert, Stuart R. Buck, and Kenneth A. Henrich by and through their undersigned attorneys, on behalf of themselves and all others similarly situated, states and alleges matters pertaining to themselves and their own acts, upon personal knowledge, and as to all other matters, upon information and belief, based upon the investigation undertaken by their counsel, as follows:

## I.   INTRODUCTION

1.   This is a case about Defendants unlawfully shortchanging participants of the Kellanova Pension Plan f/k/a the Kellogg Company Pension Plan (the "**Plan**")

1

and the WK Kellogg Co – Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Plan (the "**BCTGM Plan**") (collectively, the "**Plans**") by millions of dollars through their use of outdated formulas to calculate pension benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA"). By using outdated formulas to calculate joint and survivor annuities and preretirement survivor annuities for participants of the Plans, Defendants have harmed the financial security of these retirees and their loved ones, to Defendants' financial gain.

2.      Defendants had a fiduciary duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).  Defendants disregarded that duty, electing to use unreasonable and outdated formulas for payment of pension benefits that substantially underpaid participants of the Plans for Defendants' own financial gain.

3.      Plaintiffs bring this class action against Kellanova f/k/a Kellogg Company ("**Kellanova**"), WK Kellogg Company ("**WK Kellogg**"), the Administrative Committee of the Plan (the "**Administrative Committee**"), the Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Committee (the "**Pension Committee**") (with the Administrative Committee, the "**Committees**"), and the individual members of the Committees during the relevant

2

time period (collectively, "**Defendants**") for violations of ERISA's actuarial equivalence requirements.

4. Plaintiffs and the Classes (as defined below) are vested participants in the Plans, which deprive them of monies to which they are entitled. Specifically, Plaintiffs and the members of the Classes are retired Kellogg Company ("Kellogg") employees who receive pension benefits in the form of a joint and survivor annuity or a preretirement survivor annuity.

5. Defendants use outdated formulas based on mortality assumptions that are over 50 years old to calculate these types of benefits. These formulas result in Plaintiffs and the members of the Classes receiving less than the "actuarial equivalent" of their vested benefits, in violation of ERISA's actuarial equivalence requirements.

6. Kellogg formerly sponsored both Plans but, following the spin-off of WK Kellogg in October 2023, Kellanova became the sponsor of the Plan and WK Kellogg is the sponsor of the BCTGM Plan. Under both Plans, participants earn pension benefits in the form of a single life annuity ("**SLA**"). An SLA is a monthly benefit for the life of the participant. However, participants can elect to receive their pension benefits in forms other than an SLA, such as a joint and survivor annuity ("**JSA**").

7.     For married participants the default form of pension payment is a JSA, which provides retirees with a monthly annuity for their lives and, when they die, a contingent annuity for the life of their spouse or beneficiary. *See* 29 U.S.C. § 1055(a). Plans label JSAs as a percentage of the benefit paid during the beneficiary's life. A 50% JSA pays the spouse half the amount the retiree received each month; a 75% JSA pays the spouse three-quarters of what the retiree received each month; a 100% JSA pays the beneficiary the same amount the retiree received. Unless they choose otherwise and obtain their spouses' consent, participants who are married when their benefits commence automatically receive a 50% JSA.

8.     To convert the SLA to the JSA, the Plans use formulas based on actuarial assumptions — consisting of an interest rate and mortality table — to determine the amount by which they reduce a participant's SLA to arrive at the monthly JSA benefit amount. A JSA recipient's monthly amount will generally be less than the amount he or she would receive as an SLA because pension plans must account for paying benefits for two lives (the retiree and his or her beneficiary) rather than one. This case concerns how Defendants unlawfully reduce participants' SLA to arrive at the monthly JSA amount.

9.     ERISA requires that JSA benefits that pay between 50% to 100% (also known as "Qualified Joint and Survivor Annuities" or "**QJSAs**") be at least the "actuarial equivalent" of the retiree's SLA. *See* 29 U.S.C. § 1055(d); *see also* §

4

1055(e) (discussing the qualified preretirement survivor annuity ("**QPSA**") and how benefits must not be less than the amount which would be payable as a survivor annuity under a QJSA).

10.     Two benefit forms are actuarially equivalent when the present values of the two benefits are the same, based on reasonable actuarial assumptions. Calculating present value requires interest rates and mortality tables. Interest rates discount the value of expected future payments to the date of the calculation. Because of the time value of money, a dollar today is worth more than a dollar in the future because that dollar can be invested today and earn interest. As a result, to calculate the value of a benefit stream one must use a rate to discount the future payments to today's dollars. Mortality tables predict the rate at which retirees will die at any given age and, therefore, the chance they will receive an additional year of benefits. The interest rate and mortality table work together to generate a "conversion factor" that is applied to a participant's SLA. Once applied, the conversion factor reduces the SLA to arrive at an alternate benefit form. The actuarial assumptions used in the formula directly impact the conversion factor.

11.     For the last several decades, mortality rates have improved. Generally, retirees today live longer than retirees from the 1960s and 1970s. Accordingly, mortality tables based on data from the 1960s and 1970s predict that people will die earlier than contemporary mortality tables. All else being equal, using an antiquated

mortality table to calculate a conversion factor decreases the present value of an optional benefit form and, in turn, the monthly amount retirees receive. For example, a plan using a mortality table from the 1970s to calculate a 50% JSA — interest rates being equal — may produce a conversion factor of 0.90. In this scenario, a participant entitled to a monthly SLA benefit of $1,000 would receive $900 per month as a 50% JSA (his or her spouse would receive $450 per month). By contrast, a plan using a mortality table from 2023 — interest rates being equal — may produce a conversion factor of 0.93. The same retiree would receive $930 per month as a 50% JSA (his or her spouse would receive $465 per month).

12. When plans make actuarial conversions from one benefit form to another or from normal retirement age to early retirement, ERISA's actuarial equivalence requirements apply. These statutory requirements, along with the associated Treasury regulations, ensure that, all else being equal, the forms of pension benefit that a retiree receives, and the time they receive those benefits relative to their normal retirement age, are *at least* as valuable as the SLA they would receive at normal retirement age. *See* ERISA §§ 205(d) and (e) and 204(c)(3), 29 U.S.C. §§ 1055(d) and (e) and 1054(c)(3); 26 C.F.R. § 1.401(a)-20, Q&A 16. ERISA's actuarial equivalence requirements are designed to ensure that married participants receiving JSAs and early retirees are not penalized for their choices, regardless of the optional form they select or when they retire.

13.     ERISA § 204(c)(3) requires that an employee's accrued benefit, if it "is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . shall be the actuarial equivalent of such benefit[.]" 29 U.S.C. § 1054(c)(3). Failing to provide a participant with at least the actuarial equivalence of his or her vested benefit results in an illegal forfeiture in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

14.     Defendants violate ERISA's actuarial equivalence requirements by using outdated formulas that produce unreasonably low conversion factors and, therefore, depress the value of JSAs and preretirement survivor annuities offered to participants of the Plans. Despite the considerable increases in life expectancy over the past 50 years, Defendants continue to use antiquated actuarial assumptions that do not reflect the conditions when participants began receiving benefits. Defendants use formulas for determining optional forms of benefit that are based on the Uninsured Pensioners 1984 mortality table ("UP-84"). The UP-84 is based on mortality data from the 1960s and 1970s. Coupled with a 7% or 6% interest rate, the UP-84 produces optional form conversion factors that are consistently lower than the conversion factors produced by contemporary actuarial assumptions causing participants of the Plans who receive JSAs and preretirement survivor annuities to collect less than they would if Defendants used current and reasonable actuarial assumptions.

15. Defendants' use of formulas based on outdated actuarial assumptions to calculate participants' benefits violates ERISA's actuarial equivalence requirements. It causes participants (and their beneficiaries) to receive less than they would if Defendants determined optional forms of benefit using the reasonable assumptions required by ERISA and the accompanying regulations. and results in Plaintiffs and the members of the Classes receiving less than they would if Defendants used formulas based on reasonable and current assumptions required by ERISA and the accompanying Treasury regulations.

16. The damage caused by Defendants' unlawful use of formulas based on unreasonable actuarial assumptions to calculate JSA and QPSA benefits has negatively affected and will continue to negatively affect Plaintiffs and members of the Classes for the rest of their lives (and the lives of their spouses too).

17. Plaintiffs bring this action on behalf of a Class of retirees receiving JSAs between 50% and 100%, and QPSA recipients, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Plaintiffs seek all appropriate equitable relief, including but not limited to a declaration that the Plans' formulas for determining JSAs for retirees and QPSAs for their beneficiaries violate ERISA's actuarial equivalence and non-forfeitability requirements; an injunction requiring the Plans' fiduciaries to ensure that the Plans pay actuarially equivalent benefits to all Class members; an Order from the Court requiring Defendants to pay all amounts improperly withheld in the

past and that they will withhold in the future; an Order requiring Defendants to recalculate Plaintiff's and the Class's JSA and QPSA benefits in accordance with ERISA's actuarial equivalence requirement; an Order requiring Defendants to increase the amounts of Plaintiff's and the Class's future benefit payments, and any other relief the Court determines to be just and equitable.

## II.   JURISDICTION AND VENUE

18.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for Federal jurisdiction of actions brought under Title I of ERISA.

19.   This Court has personal jurisdiction over Kellanova because it transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides nationwide service of process.

20.   This Court has personal jurisdiction over WK Kellogg because it is headquartered in, transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides nationwide service of process.

21.   This Court has personal jurisdiction over the Committees because they transact business in, offer and pay pension benefits to participants and beneficiaries

in, and have significant contacts with this District, and because ERISA provides nationwide service of process.

22. This Court has personal jurisdiction over the individual members of the Committees because, upon information and belief, each transacts business in, resides in, and has significant contacts with this District and because ERISA provides nationwide service of process.

23. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District, Defendants employed Plaintiff Reichert and other Class members in this District, and otherwise do business in this District.

### III. PARTIES

24. Plaintiff Thomas N. Reichert resides in Climax, Michigan and is a participant in the BCTGM Plan. He worked for Kellogg for approximately 11 years. His benefits, which Defendants calculated using the Plans' unlawful formulas, began on June 1, 2019. Mr. Reichert elected the 50% JSA offered by the BCTGM Plan as a "Qualified" JSA with his wife as the beneficiary.

25. Plaintiff Stuart R. Buck resides in Battle Creek, Michigan and is a participant in the BCTGM Plan. He worked for Kellogg for approximately 13 years. His benefits, which Defendants calculated using the BCTGM Plan's unlawful

formulas, began on July 1, 2019. Mr. Buck elected the 50% JSA offered by the BCTGM Plan as a "qualified" JSA with his wife as the beneficiary.

26.   Plaintiff Kenneth A. Henrich resides in Plumas Lake, California and is a participant in the Plan. He worked for a predecessor company and then Kellogg for approximately 32 years. His benefits, which Defendants calculated using the Plan's unlawful formulas, began on February 1, 2020. Mr. Henrich elected the 100% JSA offered by the Plan as a "qualified" JSA with his wife as the beneficiary.

27.   Kellanova is a multinational food manufacturer, headquartered in Chicago, Illinois, that produces snacks, noodles, and frozen foods. Kellanova is the "plan sponsor" for the Plan within the meaning of § 3(16)(B), 29 U.S.C. § 1002(16)(B).

28.   WK Kellogg is a food manufacturer headquartered in Battle Creek Michigan, that produces cereals. Following the spin-off from Kellanova on October 2, 2023, and pursuant to an Employee Matters Agreement, WK Kellogg became the "plan sponsor" for the BCTGM Plan within the meaning of § 3(16)(B), 29 U.S.C. § 1002(16)(B).

29.   Upon information and belief, the Administrative Committee is an unincorporated association based in Battle Creek, Michigan. The Administrative Committee is a fiduciary for the Plan within the meaning of ERISA § 3(21)(A), 29

U.S.C. § 1002(21)(A) because it exercises discretionary authority or control respecting the management or disposition of assets of the Plan.

30.     Upon information and belief, the Pension Committee is an unincorporated association based in Battle Creek, Michigan. The Pension Committee is a fiduciary for the BCTGM Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority or control respecting the management or disposition of assets of the BCTGM Plan.

31.     John/Jane Does 1 through 20, inclusive, are the individual members of the Committees responsible for administering the Plans throughout the relevant time period. Their names and identities are not currently known. Upon information and belief, each transacts business in, resides in, and has significant contacts with this District.

## IV.     BACKGROUND

### A. Actuarial Equivalence Under ERISA

32.     Actuarial equivalence is a "term of art" (*Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)), which "Congress intended [] to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). If "Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (citations omitted). "And so, it makes sense

that when the 'appropriate methodology' for calculating an actuarially-equivalent value 'is not apparent from the face of the definition of actuarial equivalence, nor from the statute or regulations as in effect,' courts look 'to practice within the field of actuarial science.'" *Adams v. U.S. Bancorp*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 (D. Minn. Oct. 17, 2022) citing *Pizza Pro Equip. Leasing v. Comm'r*, 147 T.C. 394, 412 (2016), *aff'd*, 719 F. App'x 540 (8th Cir. 2018).

33.     At the heart of actuarial equivalence calculations is the concept of "***present value***." Actuarial equivalence describes two benefit streams as having equal present values. As the Court of Appeal for the D.C. Circuit explained: "Two modes of payment are actuarially equivalent when their ***present values*** are ***equal*** under a given set of assumptions." *Stephens*, 644 F.3d at 440 (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield"). Relying on the Society of Actuary's definition of actuarially equivalent benefits, the *Stephens* court instructed that "within the actuarial field, 'actuarial equivalen[ce]' is understood to require a present-value calculation." *Adams*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 citing *Stephens*, 644 F.3d at 440.

34.     Present value is the value of a payment stream, on a specific measurement date, that is adjusted for the time value of money. The Society of

Actuaries[1] defines the "Present Value" of a cash flow as the "value of a future cash flow given by a present value model under a particular set of assumptions about *future economic or other conditions* . . . ."[2]  In other words, present value is the amount that you would need to invest today at a given interest rate over a specified period in order to have an amount at the end of that period equal to a future amount.

35.     Like the Society of Actuaries, ERISA defines "present value" as "the value adjusted to reflect *anticipated events*." ERISA § 3(27), 29 U.S.C. § 1002(27). Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe."  *Id.*

36.     Calculating present value requires two primary ingredients: (1) an interest rate and (2) a mortality table. An interest rate discounts future dollars to the present. The rate is often called a "discount rate" because money available now is worth more than the same amount in the future — because it can be invested and earn interest. *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003). ("A discount rate is simply an interest rate used to shrink a future

---

[1] The Society of Actuaries ("SOA") is a global professional organization for actuaries founded in 1949 that provides the exams, certifications, and continuing education necessary to practice as an actuary in the U.S.

[2] (Emphasis added), *see* Society of Actuaries, Glossary. Available at: https://www.soa.org/4a537f/globalassets/assets/files/edu/actuarial-glossary.pdf (last accessed September 12, 2023).

14

value to its present equivalent."). A mortality table shows the rate of deaths occurring during a selected time interval and predicts the likelihood of death in an individual within the current year.[3]  Using discount rates and mortality tables, an actuary can determine whether two benefit forms (e.g., an SLA and JSA) are actuarially equivalent by comparing the present values.

37.    ERISA's actuarial equivalence requirements help ensure that pension plan participants receive at least the same value of monthly benefit regardless of the benefit form. The notion is that a participant should not be penalized for selecting one form of pension benefit over another.

38.    Under ERISA, defined benefit plans must offer at least two payment options: one for married participants (i.e., JSAs) and one for unmarried participants (i.e., SLAs). However, a JSA could pay out for longer because plans make payments to the participant and, potentially, the beneficiary. Therefore, if the monthly payment to the participant remains the same, a JSA will be more expensive than an SLA because the beneficiary may also receive payments.

39.    To account for the additional value from a JSA, plan sponsors reduce the participant's SLA or the monthly amount he or she will receive. Plans use formulas based on actuarial assumptions to determine the amount of the reduction

---

[3] *See* Society of Actuaries, definition of "Mortality" *supra* note 2.

to the SLA. The actuarial assumptions generate a conversion factor that is applied to the SLA to determine the reduction in benefits to arrive at the JSA amount. To ensure plans do not shortchange participants and their beneficiaries on their JSA benefits, Congress required that JSAs be at least "actuarial[ly] equivalent" to the SLAs offered to non-married participants. *See* 29 U.S.C. § 1055(d); *see also* 26 U.S.C. § 417 (same requirement under the Tax Code). Accordingly, actuarial equivalence should be cost-neutral, whereby the "cost" to the plan should be the same regardless of the benefit the participant selects.

40.    ERISA's actuarial equivalence requirements impose duties on pension plans in form and timing. *See Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000) ("What these provisions [ERISA's actuarial equivalence provisions] mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at *any other time* (e.g., on termination rather than retirement) or in *any other form* (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.") (Emphasis added.).

41.    With regards to the *form* of pension benefit, ERISA requires that qualified JSAs ("**QJSAs**") be at least the actuarial equivalent of the value of the SLA offered to the retiree at the times benefits commence. 29 U.S.C. § 1055(d)(1). The Tax Code repeats this definition at 26 U.S.C. § 417(b)(2) (defining QJSA as "the

16

actuarial equivalent of a single annuity for the life of the participant") and §

417(g)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life

of the participant").[4] A plan can offer multiple QJSAs ranging from 50% to 100%.

29 U.S.C. § 1055(d)(1).

42.    ERISA defines a "qualified" JSA as "any annuity in a form having the

effect of an annuity described in" ERISA § 205(d)(1). Accordingly, plans can offer

multiple "qualified" JSAs that provide the spouse with not less than 50% and not

greater than 100% of the benefit the participant was receiving. See 29 U.S.C. §

1055(d)(1); see also 26 C.F.R. § 1.401(a)-20 Q & A 20 (discussing how multiple

forms of benefit that satisfy the requirements of § 1055 can be "qualified" JSAs).

The QJSA for unmarried individuals is the SLA. See 26 C.F.R. § 1.401(a)-20 Q & A

25 ("A QJSA for a participant who is not married is an annuity for the life of the

participant").

43.    A plan must designate one of the QJSAs as the default option for

married participants, which can be more valuable than the other QJSAs offered (26

C.F.R.§ 1.401(a)-20, Q&A 16) but must be *at least* the actuarial equivalent of the

---

[4] The Internal Revenue Code (the "Tax Code") has parallel provisions for ERISA's actuarial equivalence requirements, and the Treasury regulations provide further guidance into the rules. *See* 26 U.S.C. §§ 417(b)(2), 411(c)(3); *see also* 26 C.F.R. § 1.411(c)-1(e) (referring to the "actuarial equivalence" of the participant's accrued benefit in conformance with Treasury regulations).

17

SLA (29 U.S.C. § 1055(d)(1)). If the plan offers optional forms of benefit that are more valuable than the SLA, then the default QJSA must be of at least equal value to that benefit form. *See* 26 C.F.R. § 1.401(a)-20, Q&A 16. That way, married and unmarried participants have at least one form of benefit available to them that is equivalent to the most valuable benefit form.

44.     Under ERISA, plans must also offer a QPSA. *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity paid to the participant's surviving spouse if the participant dies before his or her benefits commence. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be at least the actuarial equivalent of the amount the spouse would have received if the participant had selected the plan's default QJSA and died. ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

45.     With regards to the ***time*** a retiree opts to start receiving benefits, ERISA requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]" § 204(c)(3), 29 U.S.C. § 1054(c)(3). ERISA defines "normal retirement age" as age 65, or younger if provided by the pension plan. ERISA § 3(24), 29 U.S.C. § 1002(24); *see also* 26 U.S.C. § 411(a)(8); Treas. Reg. § 1.411(a)–7(b). In other words, if a participant chooses to begin receiving benefits prior to the "normal

retirement age," the benefit must be at least the actuarial equivalent of the amount the retiree would have received as an SLA at the normal retirement age.

46.     Calculating a JSA benefit for a participant who retires early or late involves two steps: a *vertical conversion* and a *horizontal conversion*. While the two processes can, and often do, work in tandem, ERISA sets independent limitations for each conversion process.

47.     A *vertical conversion* occurs when the participant's normal retirement benefit at normal retirement age is converted to an actuarially equivalent SLA at the participant's benefit commencement date ("**BCD**") by adjusting the benefit to offset the participant's expected number of payments. ERISA imposes no ceiling on vertical conversions, but it does impose a floor. In other words, plans can subsidize early and late benefits, but must ensure early and late retirement benefits be at least as valuable as the participant's age-65 SLA.[5]

48.     A *horizontal conversion* occurs when the participant's SLA at BCD is converted into an optional form of benefit (i.e., a JSA). Again, ERISA permits certain benefit forms to be more valuable than others, but qualified JSAs, QOSAs, and

---

[5] *See* 26 C.F.R. § 1.411(d)-3 (defining a subsidy as "the excess, if any, of the actuarial present value of a retirement-type benefit over the actuarial present value of the accrued benefit commencing at normal retirement age or at actual commencement date, if later, with both such actuarial present values determined as of the date the retirement-type benefit commences. . . ."); *see, e.g., Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000); *West v. AK Steel Corp.*, 484 F.3d 395, 406 (6th Cir. 2007).

QPSAs must have a present value that is at least equal to the SLA at BCD. Unlike vertical conversions, which use the participant's age-65 SLA as the comparator, horizontal conversions use the participant's SLA at BCD as the comparator.[6]

49.     Plans are not required to use the same formulas or methodologies for vertical and horizontal conversions. Indeed, many plans use different formulas for determining JSAs compared to the formulas plans must use to determine lump sum benefits. Likewise, some plans use formulas that subsidize early retirement benefits but do not subsidize late retirement benefits to encourage older employees to retire. While ERISA has separate actuarial equivalence requirements for vertical (§ 204), and horizontal (§ 205), the formulas used for both vertical and horizontal conversions must produce benefits that satisfy ERISA's actuarial equivalence requirements. Both vertical and horizontal conversions can give rise to ERISA claims, however, in this case, Plaintiffs challenge only the horizontal conversion.

---

[6] 26 C.F.R. § 1.401(a)-20, Q&A-16 (a plan's "QJSA must be at least as valuable as any other optional form of benefit payable under the plan *at the same time*") (Emphasis added.); *see* 26 C.F.R. § 1.401(a)-11(b)(2) ("A qualified joint and survivor annuity must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity *offered under the plan*") (Emphasis added.).

### B. Actuarial Equivalence Requires Reasonable Assumptions

50.     Reasonable assumptions must underlie the actuarial computation of present value to achieve equivalence.[7] As discussed above, ERISA defines "present value" as "the value adjusted to reflect *anticipated events*." Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.* (emphasis added.)

51.     The Treasury regulations repeatedly reference using reasonable assumptions when performing actuarial equivalence calculations. For example, the Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). Likewise, the Treasury regulation discussing protected accrued benefits defines "[a]ctuarial present value" as meaning "determined using *reasonable actuarial assumptions*." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added). Further, when making actuarial reductions to determine the early retirement benefits of terminated vested participants — which 29 U.S.C. §

---

[7] "To be equivalent means to be 'equal in force, amount, or value.' [Definition of] *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent. Only accurate and *reasonable actuarial assumptions* can convert benefits from one form to another in a way that results in equal value between the two." *Urlaub v. CITGO Petro. Corp.*, Docket No. 21 C 4133, 2022 US Dist. LEXIS 30616, at *19–20 (ND Ill. Feb. 22, 2022).

1056(a)(3) governs — the corresponding Treasury regulations instruct plans to use "reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)-14(c)(2). It "would be strange for the [Treasury] Commissioner to provide greater protection to participants who were terminated before reaching minimum early-retirement age rather than those who are active." *Adams*, 2022 US Dist. LEXIS 188713, at *21.

52.     There is also a reasonableness requirement for lump-sum distributions. Indeed, within the context of cash balance plans, the regulations require optional forms of benefit to be actuarially equivalent "using reasonable actuarial assumptions." 26 C.F.R. § 1.411(a)(13)-1(b)(3). When comparing optional forms of benefits to a QJSA, plans must use either the "applicable" mortality table and interest rates, which are "considered reasonable actuarial assumptions," or specify their own "reasonable interest rate and reasonable mortality table." 26 C.F.R. §§ 1.417(a)(3)-1(c)(2)(iv)(A)–(B) and (f)(ii)(2)(i)(A)–(B). As the court in *Adams* stated: "***A reasonableness requirement is consistent with ERISA's structure and purpose***." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *21 (emphasis in original).

53.     The American Academy of Actuaries (the "**Academy**"), a professional organization that represents and unites actuaries in all practice areas, similarly requires using reasonable actuarial assumptions. In 1988, the Academy created the Actuarial Standards Board ("**ASB**"), which promulgates standards of practice for the entire profession in the United States. The ASB issues actuarial standards of practice

("**ASOPs**") that discuss how each demographic (i.e., mortality) and economic (i.e., interest rate) assumption that an actuary selects must be reasonable. *See* ASOP Nos. 35 and 27.

54.    The ASOPs, published by the ASB, dictate that "each economic assumption used by an actuary should be reasonable." *See* ASOP 27, para. 3.6. An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the *measurement date*," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

55.    ASOP 35, discussing Demographic and Other Noneconomic Assumptions, explains that an actuary "should select reasonable demographic assumptions in light of the particular characteristics of the defined benefit plan that is the subject of measurement."[8] Para. 3.3.5 — titled "Select a Reasonable Assumption" — echoes this idea and states that an assumption is reasonable if it "reflects the actuary's professional judgment," "takes into account historical and current demographic data that is relevant as of the *measurement date*," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

---

[8] See ASOP 35, Section 3 Analysis of Issues and Recommended Practices. Available at: https://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/ (last accessed May 22, 2023).

56.     Courts have also signaled that plans should use reasonable actuarial assumptions to calculate pension benefits. *See Smith v. Rockwell Automation, Inc.*, 438 F. Sup. 3d 912, 921 (ED Wis. 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination"); *Masten v. Metropolitan Life Ins. Co. Empl. Bens. Committee*, 543 F. Sup. 3d 25, 33 (SDNY 2021) ("the Court finds it plausible that the Plan's use of decades-old mortality tables is not a 'reasonable' actuarial assumption in light of the ready availability of updated alternatives . . . the Court concludes that ***ERISA requires that Plan administrators use reasonable actuarial assumptions when converting SLAs into alternative benefits***" (emphasis added); *Urlaub,* 2022 US Dist. LEXIS 30616, at \*19 ("it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions"); *Dooley v. Am. Airlines, Inc.*, No. 81-C-6770, 1993 US Dist. LEXIS 15667, 1993 WL 460849, at \*11 (ND Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means ***equal in value*** to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are ***reasonable*** . . . .") (emphasis added).

57.     The assumptions pension plans use to determine actuarial equivalence are not reasonable simply by being expressed in the plan document. *See Laurent v. Pricewaterhouse Coopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) ("ERISA did not

leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit"); *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence'").

## V.   FACTUAL ALLEGATIONS

### A. The Plans

#### 1.   The Kellanova Pension Plan

58.   Kellogg established the Plan effective November 1, 1975. The "purpose of the Plan is to provide retirement benefits for [p]articipants." Kellanova Pension Plan Document (the "Plan Doc."), Article 1, Introduction, § 1.1. Pursuant to an amendment to the Plan in July 2023, Kellogg changed the name of the Plan to the Kellanova Pension Plan and amended the Plan so that references to the "Company" would be to Kellanova instead of Kellogg.[9] Kellanova has assumed all the powers, duties, responsibilities, and liabilities formerly held by Kellogg with respect to the Plan. *See* Plan Doc., § 14.4.

59.   The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

---

[9] *See* Amendment No. 13 to the Plan Doc.

60.     The Plan is made up of a core document with an Exhibit 1 and two Appendices. *See, generally,* Plan Doc. The core document applies to all participants (former salaried and certain hourly employees of Kellogg, its subsidiaries and affiliates, as well as to current salaried and certain hourly employees of Kellanova; beneficiaries of deceased participants are also included) while Appendix A applies to Kellogg Heritage Participants[10] and Appendix B applies to Keebler Heritage Participants.[11] *Id.* As of January 1, 2010, new salaried and certain non-hourly employees are not eligible to participate in the Plan. Based on data from the most recently filed public documents, the Plan has 3,935 Participants and Beneficiaries receiving payments from the Plan; there are 3,604 active participants as of January 1, 2022.  *See* Form 5500 for the Plan (2022).

61.     The Plan is administered by the Administrative Committee. Plan Doc., § 2.3.

---

[10] Kellogg Heritage Participants are employees who were participants of the Plan as of December 31, 2003, who were either (a) covered employees as of December 31, 2003; or (b) became covered employees on or after August 1, 2002, as a result of a transfer. *Id.*, § 2.35

[11] Keebler Heritage Participants are employees who were participants in the Prior Keebler Plan as of December 31, 2003, who were covered employees as of that date, or employees hired by Keebler Company (or a related company) before August 1, 2002, and who became a covered employee, as a result of a transfer on or after August 1, 2002, or employees hired after January 1, 2001 and represented by the UFCW Local 204, or an employee represented by the IBT Local 769, or an employee represented by USW Local 5544. *Id.*, § 2.34.

62.     Under the Plan, participants accrue benefits in the form of an SLA. Benefits are based on an accrual rate multiplied by the participant's years of credited service. *See id.,* § 2.1 (defining "Accrued Benefit"). The Plan provides that the normal form of benefit for unmarried participants is an SLA. *Id.*, § 8.2(a). For married participants, the normal form of benefit is a 50% JSA. *Id.*, § 8.2(b). The Plan also offers participants with other qualified JSA benefit forms including a 75% and 100% JSA. *Id.*, § 8.3. In 2021, the Plan began offering employees an actuarially equivalent lump sum option too.

63.     Additionally, the Plan provides for a death benefit for participants who die after attaining five years of service but before they begin receiving benefits (i.e., a QPSA). *See id.,* § 5.2. The Plan computes death benefits as if the employee retired on the day before death and benefits are paid as a 50% JSA. *Id.*, § 5.2(b). Benefits can commence on the latter of the date of death or the date the participant would have attained age 55. *Id.*, § 5.2(a)(1).

64.     The Plan defines "Actuarial Equivalence" by reference to Section 2 of Exhibit 1. *Id.*, § 2.2. Section 2 of Exhibit 1 states that the factors in Schedule A are used to determine benefits for Kellogg Heritage Participants and covered employees hired after July 31, 2002. While Schedule A does not show any factors, the Plan states the factors "are based on an interest rate of six percent (6%) and the UP-1984 Mortality Table." *Id.*, Exhibit 1, Section 2, Item 2. For Keebler Heritage Participants,

27

the Plan uses "an interest rate of seven percent (7%) and the UP-194 Mortality Table, with joint annuitant ages set back three years."[12] For lump sums and the foreign benefit offset,[13] the Plan uses the "Applicable Mortality Table" and the "Applicable Interest Rate" (defined below), both of which are prescribed by the IRS and regularly updated.

### 2. The Bakery, Confectionery, Tobacco Workers and Grain Millers Pension Plan

65. Kellogg established the Kellogg Company Bakery, Confectionary, Tobacco Workers and Gran Millers Pension Plan on October 1, 1975. The BCTGM Plan Document ("BCTGM Plan Doc."), Preamble. As a result of the spin-off on October 2, 2023, the Kellogg Company Bakery, Confectionary, Tobacco Workers and Gran Millers Pension Plan was renamed to the BCTGM Plan.[14] WK Kellogg has

---

[12] *Id.*, Item 3; a "setback" is a method of adjusting mortality rates by assuming a participant or beneficiary will have the same mortality rates as someone younger than them. For example, a 3-year setback for a 65-year-old will assume the person has the mortality rate of a 62-year-old.

[13] The Foreign Benefit Offset refers to pension benefits for employees who transfer to the plan from the BCTGM the Plan. For those participants with at least five years of service, they will receive a pension based on their entire service, but it will be offset by the "Actuarial Equivalent" of any pension they are entitled to receive under the BCTGM Plan.

[14] *See* WK Kellogg Co., Form 8-K, September 26, 2023, Item 8.01; Amendment No. 3 to the Kellogg Company Bakery, Confectionary, Tobacco Workers and Gran Millers Pension Plan.

assumed all the powers, duties, responsibilities, and liabilities formerly held by Kellogg with respect to the BCTGM Plan.[15]

66. The BCTGM Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

67. Participants in the BCTGM Plan are employees who are members of the Bakery, Confectionery, Tobacco Workers and Grain Millers Union Local Nos. 3- G, 50-G, 252-G, 374-G, and 401-G. Based on data from the most recently filed public documents, the BCTGM Plan has 3,882 participants and beneficiaries receiving payments from the BCTGM Plan; there are 1,367 active participants as of January 1, 2022. *See* Form 5500 for the BCTGM Plan (2022).

68. The BCTGM Plan is administered by the Pension Committee. *See* BCTGM Plan Doc., § 2.39.

69. Under the BCTGM Plan, participants accrue benefits in the form of an SLA. Benefits are based on a negotiated amount for each year of credited service. *See* Article 4, BCTGM Plan Doc. The BCTGM Plan provides that the normal form of benefit for unmarried participants is an SLA. *Id.*, § 6.1. For married participants,

---

[15] *See* Employee Matters Agreement, September 29, 2023, §§ 2.01(a) (stating that WK Kellogg "all [l]iabilities (regardless of when any such [l]iability arose, accrued, or is asserted" for "any WKKC Benefit Plan") 2.03 stating that WK Kellogg is retaining all WK Kellogg Benefit Plan "including all related [l]iabilities and [a]ssets . . . .").

the normal form of benefit is a 50% JSA. *Id.* The BCTGM Plan also offers participants with other qualified JSA benefit forms including a 75% and 100% JSA. *Id.*, § 6.2. The BCTGM Plan states that a participant's benefit "shall be adjusted to be the Actuarial Equivalent of a Single Life annuity." *Id.*, § 4.1(c).

70.     The BCTGM Plan also provides for a death benefit for participants who die after attaining five years of service but before they begin receiving benefits (i.e., QPSA). *Id.*, § 5.1. Subject to certain exceptions, the BCTGM Plan computes death benefits as if the employee retired on the day before death and benefits are paid as a 50% JSA. *Id.*, § 5.4(c).  Benefits can commence on the latter of the date of death or the date the participants would have attained age 55. *Id.*

71.     The BCTGM Plan defines "Actuarial Equivalence" as an amount determined based on a six percent (6%) interest rate and the UP-1984 Table, 100% male. *Id.*, § 2.2. For lump sums, the BCTGM Plan determines actuarial equivalence by using the § 417(e) rates for the month of August preceding the year in which the payment is made and the mortality tale prescribed by the IRS in § 417(e).

72.     Up until the spin-off in October 2023, the assets of the Plan and the BCTGM were pooled and held in a Master Trust, which Kellogg established to invest the Plans' assets.

### B. The Plans' QJSAs and QPSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements

73.   As discussed, throughout the relevant period, the Plans used formulas based on the UP-84 and 6% or 7% to determine the amount of participants' optional forms of benefits.

74.   Neither the interest rates nor the mortality tables underlying the Plans' formulas for calculating qualified JSAs reflect the economic conditions or the mortality rates of participants during the period when Defendants calculated Plaintiffs' and the members of the Classes benefits. Using antiquated interest rates and mortality tables is unreasonable and unlawful under ERISA.

### C. The Formulas Used to Determine Actuarial Equivalence Must Be Reasonable When the Benefits Are Calculated

#### 1.   Reasonable Discount Rates

75.   The Treasury is a reliable source for a "reasonable" discount rate for any given year. The Treasury regularly updates the discount rate, known as the "applicable interest rate." According to the Treasury, pension plans should use discount rates that reflect the actuary's "best estimate," anticipated future events, and economic data as of the measurement date. The "applicable interest rate" is based on corporate bond yields and is updated throughout the year.

76.   The applicable interest rate is a yield curve. Yield curves provide for different rates depending on when future payments are made. The applicable interest

31

rate is based on the first, second, and third Segment Rates. *See* 26 U.S.C. §§ 417(e)(3)(C) and 430(h)(2)(C).  The Segment Rates are determined using yields on corporate bonds with maturities of 0 to 5 years, 5 to 20 years, and beyond 20 years. The Segment Rates are appropriate benchmarks for pension plans because the maturity rates closely correspond to the time period over which a pension plan will pay its retirees. The following shows the IRS Segment Rates over the past six years:

| Year | 417(e) Segment Rates for March | Effective Rate |
|------|-------------------------------|----------------|
| 2023 | 5.00% / 5.20% / 5.15% | 5.11% |
| 2022 | 2.44% / 3.71% / 3.94% | 3.36% |
| 2021 | 0.69% / 2.92% / 3.69% | 2.43% |
| 2020 | 2.22% / 3.08% / 3.73% | 3.01% |
| 2019 | 2.86% / 4.00% / 4.42% | 3.76% |
| 2018 | 2.91% / 3.99% / 4.43% | 3.77% |
| 2017 | 2.06% / 3.95% / 4.75% | 3.58% |

77.     Defined benefit plans use the "applicable interest rate" to calculate the present values of lump sum benefits. Section 417(e) of the Tax Code provides that a pension plan can offer a lump sum benefit. However, the present value of the lump sum must be at least equal to the present value calculated using the "applicable mortality table" and "applicable interest rate" (collectively referred to as the "**Treasury Assumptions**"). *See* 26 U.S.C. § 417(e)(3). While a plan can subsidize a lump sum benefit, the applicable interest rate (coupled with the applicable mortality table) sets a "floor" for the present value below which a lump sum cannot go.

78.    Indeed, for providing the relative value of all benefit forms, including JSAs, the applicable interest rate is *per se* reasonable for actuarial equivalence purposes. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B).

### 2.    *Reasonable Mortality Tables*

79.    Mortality tables show the probability of death for a specific group of individuals or population groups. Pension plans use mortality tables to estimate the probability of a participant dying before they receive another year of benefits. Mortality is a key assumption in determining benefits and liabilities that should represent the "best estimate" of the expected duration of future benefit payments.

80.    Mortality tables for pension plans should be updated regularly to reflect changes in life expectancy. Indeed, "plan management should consider the specific demographics of their plan when evaluating the appropriate mortality or other assumptions to use, as well as relevant available mortality data. . . . *[management] should consider any published new mortality data for their plans in relation to their plan-specific mortality experience and future expectations*."[16]

---

[16] (Emphasis added) PWC, US Pensions Guide, Defined benefit plan financial statements, § 9.4.4, June 30, 2022. Available at: https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/pensions-and-employee-benefitspeb/peb_guide/Chapter-9-PEB/94_Defined_benefit_plan_financial_statements_8.html (last accessed September 1, 2023).

81.     Several organizations publish mortality tables used by pension plans, but the primary source is the SOA. The Retirement Plan Experience Committee ("RPEC") of the SOA publishes the mortality tables upon which many pension plans across the country rely. The SOA bases its mortality tables on "experience studies" that measure the actual mortality experience of pension plan participants in the United States.

82.     These "experience studies" were the basis for the mortality tables published by the SOA in 1971 ("**71 GAM")**, 1976 (the "**UP-84**"), 1983 (the "**1983 GAM**"), 1994 (the "**1994 GAR**"), 2000 (the "**RP-2000**"), 2014 ("**RP-2014**") and 2019 (the "**Pri-2012**"). Periodically, the tables are updated to account for changes in the mortality experience of US workers over the years. The SOA generally releases new mortality tables, or a series of tables, a few years after the corresponding data group they are named after. For example, the SOA released the RP-2000 mortality tables in 2000 based on the mortality experience of pension plan participants from 1990–1994.

83.     For the past 50 years, the SOA's experience studies show a steady upward trend in life expectancy. Retirees in the last 15 years live longer than retirees in the 1970s and 1980s. A study that the SOA published in 2014 indicated that the RP-2000 mortality tables "no longer reflect the actual mortality experience of

pension plan participants and projected trends in that experience."[17] When the SOA released the RP-2014 mortality tables, the managing director for the SOA predicted that the update would increase liabilities for pension plans between 4% and 8%.[18] The increase in liabilities spurred Moody's to conclude that plan sponsors would have to divert $110 billion to their pension plans over seven years to fund additional liabilities.[19] The chart below shows the increase in life expectancy over the last few decades and the corresponding impact on plan liabilities:

---

[17] Mortality Tables for Determining Present Value Under Defined Benefit Pension Plans, 26 C.F.R. 1, 82 FR 46388, 46397.

[18] *See* Society of Actuaries Pledges Faster Mortality Scale Updates, available at: https://www.plansponsor.com/society-of-actuaries-pledges-faster-mortality-scale-updates/ (last accessed September 1, 2023)

[19] *Id.*



*See* Plaintiff's Expert Report, *Rockwell v. Berube*, No. 20-cv-01783, ECF No. 55-5 at 18.

84. As the graph above demonstrates, a 70-year-old today is expected to live roughly 30% longer than a 70-year-old retiree in the 1980s. It is improper for a pension plan to use a 50-year-old mortality table to calculate a retiree's benefits in 2019 or 2020 because antiquated mortality assumptions fail to account for the improvements in life expectancy over the past few decades. For example, the SOA released the UP-84 — comparable to the GAM 71 shown above — in 1976. Data collected from 1965–1970, now **over 50 years old**, form the basis of the UP-84. In the last 50 years, there have been substantial improvements in lifestyle habits and

healthcare, which lowered the mortality rates of pensioners. The UP-84 does not account for these improvements.

85.     Further, the UP-84 was compiled in an era when much of the workforce was male; only 20% of the mortality experience reflected in the UP-84 is based on female employee experience. Because the SOA released the UP-84 before the significant improvements in life expectancy and shifts in the US workforce in the last 50 years, it is no longer an appropriate table for calculating pension benefits for retirees from 2017 to the present. Nevertheless, pension plans, like the Plans, continue to use the UP-84 as a basis to calculate retirees' benefits today.

86.     A benchmark for reasonable mortality rates is the mortality assumption released by the Treasury. Like discount rates, the Treasury also releases the "applicable mortality table," based on the most up-to-date SOA mortality tables. When prescribing the applicable mortality tables, the Secretary must consider the "results of available independent studies of mortality of individuals covered by pension plans."[20] *Id.* In other words, the IRS defers to the SOA when it comes to the mortality rates of pensioners.

87.     Plan sponsors must make minimum contributions to their pension plans, and the Treasury prescribes the tables that plans should use. For plan years

---

[20] 87 FR 25161, 25162.

beginning on or after January 1, 2023, the Treasury regulations prescribe the use of mortality tables based on the Pri-2012 Report,[21] which is based on RPEC's experience study for the period 2005–2014 and is the best available study of the actual mortality experience of pensioners.[22] The "applicable mortality table" must be updated (at least every ten years, but, in practice, the Treasury updates the rates more frequently) and "must be based on the actual experience of pension plans . . . ." 26 U.S.C. § 430(h)(3)(A).

88.    For measuring pension plan liabilities, plan sponsors can apply to use plan-specific mortality tables that more accurately reflect the experience of a given plan's participants. *See* 26 U.S.C. § 430(h)(3)(C). If a plan has enough participants and has been around long enough, it can apply to the IRS to use company-specific mortality tables based on the experience of the plan's participants to determine present values under § 430. Similarly, plans can use separate mortality tables for disabled participants because disabled participants generally have different mortality rates from healthy pensioners. *See* 26 U.S.C. § 430(h)(3)(D). Like the plan-specific tables, mortality tables used for disabled participants must be periodically updated. Through its regulatory guidance, the Treasury believes that it is important to

---

[21] *See* IRS Notice 2022-22; *see also* 87 FR 25161, 25163.

[22] *See* 87 FR 25161, 25163.

regularly update mortality tables used by pension plans to ensure that they are accurate and reflect the latest mortality trends.

89.     As discussed, the Treasury Assumptions, including the applicable mortality table, are *per se* reasonable for determining the present values of different benefit forms. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### D. The Plans' Formulas for Calculating Survivor Annuities and Preretirement Survivor Annuities Do Not Satisfy ERISA

90.     As discussed, the Plans use formulas based on the UP-84 and a 6% or 7% discount rate throughout the relevant period to convert the SLA offered to participants to qualified JSAs and to convert the SLA that participants would have received into QPSA benefits for participants and their beneficiaries.

91.     Using these formulas was and continues to be unreasonable because they do not reflect the economic conditions on the participants' measurement dates (i.e., the dates Defendants determined their benefits). Similarly, the mortality rates underlying the formulas do not reflect the experience of the participants or pensioners in general, let alone future "anticipated events" (i.e., the anticipated mortality rates of pensioners).

92.     The unreasonably low conversion factors produced by the Plans' formulas result in JSA benefits that violate ERISA's actuarial equivalence requirements. The JSA benefits produced using these formulas are not at least actuarially equivalent to the SLA that participants were offered when their benefits

39

started. Accordingly, Plaintiffs and members of the Classes are receiving substantially less each month than they would have if the Plans had used reasonable formulas.

93.    The conversion factors produced by these assumptions, when calculating JSAs and QPSAs are unreasonably low compared to the conversion factors produced using reasonable assumptions. The following chart shows an approximate comparison of the conversion factors using the Plans' UP-84 and 6% formulas and the conversion factors using the § 417(e) assumptions from 2019:

| Year | Benefit Form | The Plan's Conversion Factors | Monthly Amount Using Conversion Factors Produced by Plan Formula | Conversion Factors Produced Using Treasury Assumptions | Monthly Amount Using the Treasury Conversion Factors | Percent Difference in Benefit Amount |
|------|--------------|-------------------------------|----------------------------------------------------------------|--------------------------------------------------------|------------------------------------------------------|--------------------------------------|
|      | SLA          | N/A                           | $1,000.00                                                      | N/A                                                    | $1,000.00                                            | N/A                                  |
| 2019 | 50% JSA      | 0.8350                        | $835.00                                                        | 0.8918                                                 | $891.80                                              | **6.3%**                             |
|      | 75% JSA      | 0.7713                        | $771.30                                                        | 0.8460                                                 | $846.00                                              | **8.8%**                             |
|      | 100% JSA     | 0.7167                        | $716.70                                                        | 0.8047                                                 | $804.70                                              | **10.9%**                            |

94.    The chart above demonstrates that Defendants' use of unreasonable and unlawful formulas results in a substantial difference in monthly income.

95.    Plaintiff Reichert began collecting benefits under the Plan on June 1, 2019. He accrued and was offered an SLA that would have paid him $455.69 per month. He selected the 50% JSA, which pays $380.50 per month. If Treasury

Assumptions were used to calculate his benefits, Plaintiff Reichert's benefit would be approximately $406.39 or $25.89 more per month. By converting the SLA Plaintiff Reichert was offered using an unreasonable formula — based on outdated actuarial assumptions that produce unreasonably low conversion factors — instead of reasonable, contemporary actuarial assumptions like the Treasury Assumptions, Defendants reduced the present value of Plaintiff Reichert's benefits by approximately $4,706 (past damages of $1,320.39 and future damages of $3,385.61).

96.     Plaintiff Buck began collecting benefits under the Plan on July 1, 2019. He accrued and was offered an SLA that would have paid him $563.75 per month. He selected the 50% JSA, which pays $467.46 per month. If Treasury Assumptions were used to calculate his benefits, Plaintiff Buck's benefit would be approximately $499.87 or $32.41 more per month. By converting the SLA Plaintiff Reichert was offered using an unreasonable formula — based on outdated actuarial assumptions that produce unreasonably low conversion factors — instead of reasonable, contemporary actuarial assumptions like the Treasury Assumptions, Defendants reduced the present value of Plaintiff Buck's benefits by approximately $5,802 (past damages of $1,717.73 and future damages of $4,084.27).

97.     Plaintiff Henrich began collecting benefits under the Plan on February 1, 2020. He likely accrued and was offered an SLA of approximately $1,683.19 per

month.[23] Plaintiff Henrich selected the 100% JSA, which pays him $1,273.52 per month. If Treasury Assumptions were used to calculate his benefits, Plaintiff Henrich's benefit would be approximately $1,338.05 or $64.53 (5.1%) more per month. By converting the SLA Plaintiff Henrich was offered using an unreasonable formula — based on outdated actuarial assumptions that produce unreasonably low conversion factors — instead of reasonable, contemporary actuarial assumptions like the Treasury Assumptions, Defendants reduced the present value of Plaintiff Henrich's benefits by approximately $15,053 (past damages of $2,968.38 and future damages of $12,084.62).

98.     Because the Plans use outdated formulas, based on unreasonable actuarial assumptions like the UP-84 coupled with a 6% and 7% discount rate, to convert the SLA participants were offered to optional benefit forms, while using reasonable actuarial assumptions — like those used by the Plans for determining lump sum benefits and the foreign benefit offset — Defendants caused participants receiving qualified JSAs to receive benefits that are less than the actuarial equivalent of the SLA they were offered. Thus, using these outdated formulas to determine

---

[23] To demonstrate the scope of his alleged damages, Plaintiff Henrich relies on estimated figures, based on the formulas stated in the Plan, to recreate the amount of the SLA he was offered. Plaintiff Henrich's initial SLA offer documentation is currently unavailable, but Defendants, believed to hold documentation showing the exact amount of the SLA he was offered, can readily verify or correct these approximations.

optional benefit forms deprives participants of the full amount of benefits to which they are entitled whilst Defendants reap the benefits.

### E. The Plans Use Updated Actuarial Assumptions for Other Purposes

99.     Defendants regularly update the actuarial assumptions used for determining the present value of the Plans' pension benefit obligation ("PBO"). The PBO is the present value of all future pension payments that a plan must make. The PBO is a liability on a company's balance sheet, and, therefore, public companies like Kellanova and WK Kellogg must disclose their PBO to investors in their annual 10-K filings with the SEC. If determining pension benefits is one side of the actuarial calculation coin, the other side would be determining a plan's PBO. Like calculating pension benefits, plan sponsors use formulas based on actuarial assumptions to calculate a plan's PBO. The actuarial assumptions underlying a plan's PBO must be reasonable to report the plan's PBO to the company's shareholders accurately.

100.    Defendants are well aware of the requirement to regularly update the assumptions used to calculate its PBO. Indeed, Kellogg (now Kellanova) developed the discount rate for measuring the Plans' PBO based on "a cash-flow matching analysis using [its actuary's] Willis Towers Watson's proprietary RATE:Link tool and projections of the *future benefit payments* constituting the projected benefit

43

obligation for the plans."[24] These rates, which are consistent with standard indices such as the Citigroup Pension Liability Index and Mercer Above Mean Curve, are used as benchmarks to determine the discount rate to use. As the company stated, "we select yield curves to measure our benefit obligations that are consistent with market indices during December of each year."[25] Kellogg used the following discount rates to determine the present value of the Plan's liabilities:

| Year | Discount Rate |
|------|---------------|
| 2022 | 5.3% |
| 2021 | 2.6% |
| 2020 | 2.2% |
| 2019 | 2.9% |
| 2018 | 3.9% |
| 2017 | 3.3% |
| 2016 | 3.6% |

101.   Kellogg actively took steps to ensure that the present value of the Plans' liabilities was as accurate as possible. In 2016, Kellogg changed the method it used for estimating service and interest costs related to its pensions from a single weighted-average discount rate to a full yield curve. The full yield curve approach operates "by applying specific spot rates along the yield curve used to determine the benefit obligation of relevant projected cash outflows."[26] Kellogg made the switch

---

[24] *See* Kellogg Form 10-K for the fiscal year ending December 31, 2022, at 77.

[25] *Id.*

[26] Kellogg Form 10-K for the fiscal year ending December 30, 2017, at 95.

because the new method provided "a more precise measurement of service and interest costs by aligning the timing of the plan's liability cash flows to the corresponding spot rate on the yield curve."[27] In other words, Kellogg made the change because it wanted a more precise way of measuring the Plans' liabilities.

102.   Kellogg also regularly updated the mortality tables to calculate the Plans' PBO. In Kellogg's last 10-K, the company stated:

> ***Assumed mortality rates of plan participants are a critical estimate in measuring the expected payments a participant will receive over their lifetime and the amount of expense we recognize***. In 2019, the Society of Actuaries (SOA) published updated mortality tables and an updated improvement scale. In 2021, the SOA released an improvement scale that incorporated an additional year of data. In 2022, the SOA did not release an updated improvement scale. ***In determining the appropriate mortality assumptions as of 2022 fiscal year-end, we used the 2019 SOA tables with collar adjustments based on Kellogg's current population***, consistent with the prior year.[28]

103.   Similarly, in its 10-K for the fiscal year ending December 30, 2017, Kellogg stated "[a]t the end of 2014, the Company revised its mortality assumptions after considering the [SOA's] updated mortality tables and improvement scale, as well as other mortality information . . . to ***develop assumptions aligned with the***

---

[27] *Id.*

[28] Kellogg Form 10-K for the fiscal year ending December 31, 2022, at 49.

*company's expectation of future improvement rates*."[29] With each new release of an updated mortality table, Kellogg updated the mortality assumption used to calculate the Plans' liabilities. Inexplicably, however, Kellogg failed to make the same updates to the formulas used to calculate optional benefit forms for participants in the Plans. Thus, when it came to determining the present value of the Plans' *liabilities*, Kellogg regularly updated the actuarial assumptions used to ensure they reflected the conditions at the time the liability was measured but failed to make the same updates to the formulas for determining plan benefits.

104. There is no reasonable explanation for why the Plans used different assumptions to calculate JSA benefits for participants and the associated liabilities. These determinations involved the same lives and, accordingly, updated assumptions should have been used for both benefit and liability determinations. Defendants have been causing significant financial harm to Plaintiffs and members of the Classes by employing outdated and unreasonable formulas to calculate benefits, despite having no lawful reason to do so.

105. Defendants' use of unreasonable formulas, based on outdated actuarial assumptions, for calculating participants' benefits results in Plaintiff and the Class

---

[29] Kellogg Form 10-K for the fiscal year ending December 30, 2017, at 95 (emphasis added).

Members receiving significantly less than the total amount of benefits to which they are lawfully entitled under ERISA.

## VI.   CLASS ACTION ALLEGATIONS

106.   Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following classes (together, the "Classes"):

"Kellanova Class":

All participants and beneficiaries of the Plan who (1) accrued benefits in the form of an SLA, (2) began receiving benefits on or after September 14, 2017, (3) are receiving a JSA with a survivor benefit of at least 50% and no more than 100% of the benefit paid during the participant's life, or are receiving a QPSA, and (4) are receiving a benefit where the actuarial present value of their annuity as of the date benefits began was less than the actuarial present value of the SLA they were offered using the "Applicable Interest Rate" and "Applicable Mortality Table" as defined in the Plan as of the date benefits began.

"WK Kellogg Class":

All participants and beneficiaries of the BCTGM Plan who (1) accrued benefits in the form of an SLA, (2) began receiving benefits on or after September 14, 2017, (3) are receiving a JSA with a survivor benefit of at least 50% and no more than 100% of the benefit paid during the participant's life, or are receiving a QPSA, and (4) are receiving a benefit where the actuarial present value of their annuity as of the date benefits began was less than

47

the actuarial present value of the SLA they were offered using the BCTGM Plan's formula for determining lump sum benefits as defined in the as of the date benefits began.

Excluded from the Classes are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plans.

107. The members of the Classes are so numerous that joinder of all members is impractical. The Classes include hundreds of individuals. Based on government filings, as of January 1, 2022, over 3,935 participants and beneficiaries were receiving benefits under the Plan and 3,832 participants and beneficiaries were receiving benefits under the BCTGM Plan.

108. Plaintiffs' claims are typical of the members of the Classes because they arise out of the same policies and practices as alleged herein, and all members of the Classes are similarly affected by Defendants' wrongful conduct. Plaintiffs and all members of the Classes seek identical remedies under identical legal theories, and Plaintiffs' claims do not conflict with the interests of any other members of the Classes in that Plaintiffs and the other members of the Classes were subject to the same conduct and suffered the same harm.

109. There are questions of law and fact common to the Class, which predominate over questions affecting only individual members of the Classes. Common legal and factual questions include, but are not limited to:

A. Whether the actuarial assumptions used to determine the value of participants' JSAs and QPSAs are unreasonable;

B. Whether the actuarial assumptions used to determine the value of participants' JSAs violate the actuarial equivalence requirements of ERISA;

C. Which actuarial assumptions would produce a reasonable conversion factor to apply to Plaintiffs' and members of the Classes SLAs to satisfy ERISA's actuarial equivalence requirements;

D. Whether the actuarial assumptions used by the Plans to calculate participants' benefits caused harm to Plaintiffs and members of the Classes;

E. Whether the Committees violated their fiduciary duties of loyalty and prudence under ERISA;

F. Whether the Committees should be enjoined from applying the Plans' formulas for calculating participants' JSAs and QPSAs and instead be required to calculate benefits for Plaintiffs and members of the Classes based on reasonable actuarial assumptions; and

G. Whether Plaintiffs and members of the Classes should receive additional benefits.

110. Plaintiffs will fairly and adequately represent the Classes because Plaintiffs have no interests antagonistic to those of other members of the Classes, and the adjudication of their claims will necessarily decide the identical issues for all other members of the Classes. Plaintiffs are committed to the vigorous prosecution of this action.

111. Plaintiffs have retained counsel competent and experienced in ERISA and class action litigation.

49

112.   Plaintiffs do not anticipate any difficulty in management of this matter as a class action.

113.   The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants.

114.   The requirements of Rule 23(b)(1)(B) are satisfied because prosecution of separate actions by the members of the Classes would create a risk of adjudications for individual members of the Classes that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

115.   Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief for the Classes.

116.   Individual members of the Classes do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because the equitable relief sought by any member of the Classes will either inure to the benefit of the Plans or affect each member of the Classes. If the Classes are not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because the questions of law or fact common to the members of the Classes

predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy because the damages suffered by each individual member of the Classes is relatively modest compared to the expense and burden of individual litigation. It would be impracticable for members of the Classes to seek redress individually for the wrongful conduct alleged herein. There will be no difficulty in the management of this litigation as a class action as the legal issues affect standardized conduct by Defendants and class actions are commonly used in such circumstances. Furthermore, since joinder of all members is impracticable, a class action will allow for an orderly and expeditious administration of the claims of the Classes and will foster economies of time, effort and expense.

## VII.  CAUSES OF ACTION

### COUNT I: VIOLATION OF ERISA'S JSA
### ACTUARIAL EQUIVALENCE REQUIREMENT
### (ERISA § 205, 29 U.S.C. § 1055)

117. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

118. The Plans improperly reduce participants' JSA and QPSA benefits below what they would receive if those benefits satisfied ERISA's actuarial equivalence requirements.

51

119.   ERISA § 205(d), 29 U.S.C. § 1055(d) requires plans to provide QJSAs that are "the actuarial equivalent of a single annuity for the life of the participant." Similarly, the applicable Treasury regulations state that plans must provide QJSAs that are "at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan . . . determined, on the basis of consistently applied *reasonable actuarial factors*[.]" 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).

120.   Because the Plans use unreasonable formulas, based on outdated, unreasonable actuarial assumptions, to calculate participants' benefits, the JSA and QPSA benefits they receive (and their beneficiaries receive) are not actuarially equivalent to the SLA Defendants offered them.

121.   Defendants' use of unreasonable formulas to calculate these benefits is a violation of ERISA at Section 205(d), 29 U.S.C. § 1055(d).

122.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

123.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's actuarial

equivalence requirements outlined in § 1055(d), including but not limited to the relief set forth below in the Prayer for Relief.

## COUNT II: BREACHES OF FIDUCIARY DUTY
### (ERISA § 404, 29 U.S.C. § 1104)

124. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

125. During all relevant times, the Committees were acting fiduciaries of the Plans and were responsible for paying benefits in accordance with ERISA's requirements and the Plans' terms, unless those terms themselves violated ERISA.

126. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), imposes several fiduciary duties on Plan Administrators, including the duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence" — which includes ensuring that benefits paid pursuant to a defined benefit plan conform with ERISA's statutory requirements — and the duty to act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with* the provisions of" subchapters I and III of ERISA. 29 U.S.C. § 1104(a)(1) (emphasis added).

127. Here, the Committees and their members are fiduciaries for the Plans because they exercise discretionary authority or discretionary control respecting the management of the Plans as well as authority and control over the disposition of the

Plans' assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They had authority or control over the amount and payment of JSAs and QPSAs from the Plans' assets.

128. The Committees breached these fiduciary duties by administering Plans that did not conform with ERISA's actuarial equivalence requirements. The Committees acted disloyally by causing Plaintiffs and the members of the Classes to receive benefits that were not actuarially equivalent to the SLAs they were offered when they commenced benefits thereby enabling Kellogg, Kellanova, and WK Kellogg, as Plan Sponsors, to retain additional money by reducing the minimum amount it was required to contribute to the Plans.

129. The Committees failed to act prudently and diligently by failing to sufficiently review the terms of the Plans, including the formulas used to calculate participants' optional benefit forms. This caused Plaintiffs and the Classes to receive less than the full value of their vested benefits. Further, the Committees failed to update the unreasonable formulas used to determine participants' benefits despite updating the assumptions used to calculate the Plans' PBOs.

130. The Committees' breaches, as set forth herein, caused participants to forfeit a portion of their benefits.

131. ERISA requires fiduciaries who appoint other fiduciaries to monitor their actions to ensure they comply with ERISA. Kellogg, Kellanova, and WK

Kellogg therefore had fiduciary duties to monitor the actions of the Committees to ensure the Plans complied with ERISA.

132.   Kellogg, Kellanova, and WK Kellogg breached their fiduciary duties to supervise and monitor the Committees by allowing them to pay benefits that were not actuarially equivalent, which is a violation of ERISA.

133.   As a direct and proximate result of these fiduciary breaches, members of the Classes lost millions of dollars in vested accrued pension benefits.

134.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

135.   Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's fiduciary duties outlined in § 404(a)(1), 29 U.S.C. § 1104(a)(1), including but not limited to the relief set forth below in the Prayer for Relief.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs Reichert and Buck as Class representatives for the WK Kellogg Class, appointing Plaintiff Henrich as Class representative for the Kellanova Class, and appointing the undersigned to act as Class Counsel;

B.     A declaratory judgment that the formulas used by the Plans for determining JSAs and QPSAs violate ERISA's joint and survivor annuity requirements set forth in § 205(d), 29 U.S.C. § 1055(d);

C.     A declaratory judgment that the Committees breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following terms of the Plans that violated ERISA, failing to adequately monitor and review the terms of the Plans to ensure they complied with ERISA, and for failing to pay benefits to participants in conformance with ERISA's actuarial equivalence requirements outlined in § 205(d), 29 U.S.C. § 1055(d);

D.     A declaratory judgment that Kellogg, Kellanova, and WK Kellogg breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, failing to adequately monitor the Committees in the execution of their fiduciary duties;

56

E.   An Order requiring Defendants to provide an accounting of all prior payments of benefits to the members of the Classes under the Plans for which the unreasonable formulas were used to determine JSA and QPSA benefits, and provide information to recalculate those payments to members of the Classes members in compliance with ERISA § 205(d), 29 U.S.C. § 1055(d);

F.   Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plans and ordering Defendants to pay future benefits to participants in accordance with ERISA § 205(d), 29 U.S.C. § 1055(d);

G.   Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 205(d), 29 U.S.C. § 1055(d);

H.   Restitution of all amounts Defendants kept in the Plans but were obliged to pay to Plaintiffs and other members of the Classes in accordance with ERISA § 205(d), 29 U.S.C. § 1055(d);

I.   Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of the violations of ERISA § 205(d), 29 U.S.C. § 1055(d);

J.  Relief to the Plans from the Committees for their violations of ERISA § 404, 29 U.S.C. § 1104, including a declaration that the formulas used to determine JSAs and QPSAs violate ERISA § 205(d), 29 U.S.C. § 1055(d); restoration of losses to the Plans and its participants caused by the Committees' fiduciary violations; disgorgement of any benefits and profits the Committees received or enjoyed from the use of the Plans' assets or violations of ERISA; surcharge; payment to the Plans of the amounts owed to members of the Classes caused by fiduciary breach so that those amounts owed can be provided to participants of the Plans; and all appropriate injunctive relief, such as an order requiring the Committees to pay all participants fully ERISA-compliant benefits in the future and to ensure that all benefits they pay to participants conform to the requirements set forth in ERISA § 205(d), 29 U.S.C. § 1055(d);

K.  An award of pre-judgment interest on any amounts awarded to Plaintiffs and the Classes pursuant to law;

L.  An award of Plaintiffs' attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M.  Any other relief the Court determines is just and proper.

58

**SIRI & GLIMSTAD LLP**

/s/ *Oren Faircloth*

Oren Faircloth
Lisa R. Considine
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: lconsidine@sirillp.com

*Attorneys for Plaintiffs*